IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EXELON GENERATION ACQUISITIONS, LLC, | § § § | No. 28, 2017 |
| Defendant Below, Appellant/Cross-Appellee, | § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | C.A. No. N13C-07-330 |
| DEERE & COMPANY, | § § § | |
| Plaintiff Below, Appellee/Cross-Appellant. | § § § | |

Submitted: October 4, 2017
Decided: December 18, 2017

Before **STRINE**, Chief Justice; **VALIHURA**, **SEITZ**, and **TRAYNOR**, Justices; and **GLASSCOCK**, Vice Chancellor,[*] constituting the Court *en banc*.

Upon appeal from the Superior Court. **REVERSED**.

David J. Margules, Esquire, BALLARD SPAHR LLP, Wilmington, Delaware; Matthew E. Price, Esquire, (*argued*), JENNER & BLOCK LLP, Washington, D.C.; Geoffrey A. Kahn, Esquire, Matthew A. White, Esquire, Of Counsel, BALLARD SPAHR LLP, Philadelphia, Pennsylvania, *Attorneys for Defendant Below, Appellant/Cross-Appellee.*

Peter J. Walsh, Jr., Esquire, (*argued*), Matthew F. Davis, Esquire, Jacob R. Kirkham, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Plaintiff Below, Appellee/Cross-Appellant.*

**TRAYNOR**, Justice:

---

[*] Sitting by designation under Del. Const. art. IV, § 12.

When Exelon Generation Acquisitions purchased Deere & Company's wind energy business, it agreed to make earn-out payments to Deere if it reached certain milestones in the development of three wind farm projects that were underway at the time of the sale. One of the projects was the Blissfield Wind Project, which was defined in the parties' Purchase Agreement as "the wind project under development in Lenawee County, Michigan, by Blissfield Wind Energy, LLC with a nameplate capacity of 81 megawatts."[1] Included in the sale of the Blissfield Wind Project was a "Power Purchase Agreement"—a binding commitment Deere had secured from a local utility to purchase energy from the wind farm once it commenced operations.

It is undisputed that Exelon was unable to bring the Lenawee County site to fruition because of civic opposition. But shortly thereafter, Exelon managed to acquire another nascent wind farm from a different developer, this time at a site in Gratiot County, Michigan, about a hundred miles away from the site of the Blissfield Wind Project. Exelon managed to persuade the local utility to transfer the Power Purchase Agreement there, and this time, the wind farm was successful.

Deere caught wind of Exelon's success with the new site (and its use of the Power Purchase Agreement) and filed suit to recover the earn-out payment, claiming that "Exelon had simply relocated the Blissfield Wind Project to Gratiot County"[2]

---

[1]     App. to Opening Br. A302.

[2]     Complaint ¶ 26, No. N13C-07-330 (Del. Super. Ct. July 25, 2013).

and that the earn-out payment obligation had traveled with it. Exelon denied that it had relocated the project, contending that, after it was prevented from developing the Blissfield Wind Project by forces beyond its control, it acquired and developed, at great expense, a new project in Gratiot County with different counterparties, developers, equipment manufacturers, landowners, townships, counties, and permits.

On cross-motions for summary judgment, the Superior Court sided with Deere's interpretation of the Purchase Agreement and ordered Exelon to pay the $14 million earn-out payment for successfully developing a wind farm in Gratiot County. We disagree with the Superior Court's interpretation of the Purchase Agreement and therefore reverse.

## I
### A

In August of 2010, Exelon agreed to acquire all of the limited liability company interests of John Deere Renewables, LLC, a wholly owned subsidiary of Deere & Company that held its wind assets. The base purchase price was $860 million.

One of the subsidiary LLCs that Exelon acquired was Blissfield Wind Energy, LLC, of which Deere owned a 50% interest, the other 50% being held by a separate entity called Great Lakes Wind, LLC. At the time of the transaction, Blissfield was

2

developing a wind farm called the Blissfield Wind Project, which the Purchase Agreement between Exelon and Deere defined as "the wind project under development in Lenawee County, Michigan, by Blissfield Energy, LLC, with nameplate capacity of 81 megawatts."

Just two months before the sale, Deere had succeeded in securing a power purchase agreement (PPA) for the Blissfield Wind Project with Consumers Energy Company, an electric utility in Michigan. Under the PPA, which stipulated that the Blissfield Wind Project would be located in Lenawee County, Michigan, Consumers agreed to purchase energy generated by the Project for twenty years at a fixed rate schedule. It is undisputed that a PPA is a valuable asset that helps to ensure the viability of a wind farm.

At the time of the sale, Blissfield was one of three wind farms under development in Michigan for which Deere had secured PPAs, which the Purchase Agreement collectively referred to as the Michigan Wind Projects. As a condition of the sale, Exelon agreed that if those three Projects were to achieve certain development milestones, it would pay Deere an additional amount, above the base purchase price, for each Project that achieved the milestones (a so-called earn-out payment). Whether Exelon owes Deere an earn-out payment for the Blissfield Wind Project is at the center of this dispute.

3

## B

When the Purchase Agreement was executed, the parties were aware that there was civic opposition to the development of a wind farm in Lenawee County. And although Deere represented in the Agreement that it "reasonably believe[d] that all material Permits necessary for the development, construction, ownership, maintenance, use and/or operation of the [three] Michigan Wind Projects. . . [could] be obtained in the ordinary course,"[3] one of Deere's disclosure schedules that was attached to the Agreement warned of the possibility of a moratorium on wind energy projects in Riga Township, the planned location in Lenawee County for the Blissfield Wind Project.[4] In fact, an internal Deere memorandum revealed that Deere believed that the vice chair of the Riga Township Planning Commission

---

[3]     App. A336.

[4]     Under headings that read "Michigan Wind Projects Permits – Blissfield Wind Project," the disclosure states:

> The Riga Township Planning Commission voted on August 2, 2010 to recommend to the Riga Township Board a 12-month moratorium on wind energy projects, which is scheduled to be considered by the Riga Township Board at its September 13, 2010 meeting. The moratorium, as currently proposed, would automatically expire upon approval of a wind energy zoning ordinance.

> If 15% of the registered voters in a Michigan township sign a petition requesting a referendum within 30 days after a zoning ordinance is enacted in such township, the zoning ordinance would become subject to a referendum vote at the next scheduled election. Based on the level of resistance to the Blissfield Wind Project in Riga township there is a possibility that a zoning ordinance permitting the project would be put to a referendum.

App. A454.

"[was] actively working with the opponents of the [Blissfield] project to prevent the wind projects in Riga from becoming a reality."[5] Against this backdrop, Exelon and Deere executed the Purchase Agreement.

Only eleven months after they signed the Purchase Agreement, Riga Township passed a zoning ordinance that rendered development of the Blissfield Wind Project "impossible" from a regulatory perspective.[6] Consequently, Exelon provided Consumers Energy with a notice of a force majeure event under the PPA,[7] which suspended Exelon's obligations and jeopardized its chance to use the PPA.

## C

After the setback in Lenawee County, Exelon began to devise ways to salvage the PPA. Within a month of declaring the force majeure event, Exelon informed Consumers that it was "pursuing several alternatives,"[8] including the possibility of submitting a request to the Riga Township authorities for a new zoning ordinance to allow the development to go forward, acquiring additional parcels in nearby Ogden

---

[5]     App. A287.

[6]     App. A719.

[7]     The PPA defines "Force Majeure" as "acts or actions beyond the reasonable control of the affected Party, including without limitation, acts of God; flood; earthquake; storm or other natural calamity; war; insurrection; riot; curtailment (including any curtailment ordered by any Reliability Authority), order, regulation or restriction imposed by governmental authority; fire or explosion not caused by criminal acts by the Party claiming Force Majeure; transportation accidents or perils at sea; or other similar cause beyond the reasonable control but not due to negligence of the Party affected." App. A259.

[8]     App. to Answering Br. B177.

Township and constructing a wind farm there, which would have satisfied the PPA's requirement that a wind farm be built in Lenawee County, and assessing the feasibility of "moving the Project" to an "alternative site . . . in a nearby county within Michigan."[9] Exelon ultimately decided to pursue the last of these alternatives, hopeful that Consumers would be willing to amend the PPA to allow the wind farm to be built in either Gratiot or Ionia County, rather than Lenawee. To that end, Exelon sent a draft letter to Consumers stating that, while it could not proceed with the "Blissfield Wind project . . . at the current Plant Site"[10] (i.e., Lenawee County), Exelon believed that the PPA could be amended with Consumers' consent to allow the wind farm to be built in an area in Michigan with a more favorable political climate for wind development.

Consumers was initially reluctant to amend the PPA,[11] but eventually agreed, subject to the necessary regulatory approvals. This modification did not come without a cost to Exelon: it agreed to reimburse Consumers for tax credits Consumers might lose if the project were not completed before the credits expired. This amounted to approximately $16 million in new risk for Exelon, although, as

---

[9]     App. B178.
[10]    App. B174.
[11]    App. A528–29 (containing an email thread among Exelon employees in which one employee, who spoke with Consumers, reported to the others that while Consumers was "open to discussion," it was "not willing," at that time, "to say that they support it" in light of Consumers' concerns that a transfer of the PPA to a "replacement project" would lead to delays and likely require regulatory approval).

will be seen, that risk never came to fruition. In due course, the amended PPA received regulatory approval.

Around that same time, Exelon purchased a wind farm development known as the Beebe Wind Farm from another developer, Nordex USA, Inc., for $10.3 million. This development was located in less wind-hostile Gratiot County, about a hundred miles from Lenawee County, and this time, there was no civic opposition that prevented Exelon from bringing the wind farm online. With the amendment that Exelon and Consumers had made to the PPA, the Beebe Wind Farm satisfied the PPA's milestones, and Exelon succeeded in getting to use a PPA that seemed all but lost when development faltered in Lenawee County.

Exelon did continue its efforts to develop a wind farm in other parts of Lenawee County, but because the other townships were as opposed as Riga to having a wind farm in their backyards, those efforts were unsuccessful. So in May 2012, citing the restrictive wind energy ordinances passed by officials in Lenawee County, Exelon notified Deere that it was abandoning the Blissfield Wind Project. Section 2.6(b) of the Purchase Agreement contained a mechanism for Exelon to release itself from its contractual obligation to continue to develop the Project if further development were to become commercially infeasible, and Exelon invoked that mechanism here:

> In the event [Exelon] reasonably determines that continuing to proceed with any one or more of the Michigan Wind Projects would not be

7

commercially reasonable and therefore determines to permanently cease development of and abandon such Michigan Wind Project(s), [Exelon] shall so inform [Deere], including the reason therefor and thereafter [Exelon] shall have no further obligation to [Deere] in connection with such development . . . .[12]

## II

Deere has never contested Exelon's assertion that it was not commercially reasonable to proceed with the development of the Blissfield Wind Project in Lenawee County. Instead, Deere contends that, despite the notice of abandonment, Exelon did not actually abandon the Project—it merely relocated it to the Beebe Wind Farm in Gratiot County and satisfied the earn-out-triggering milestones there. Although Deere admits that the Purchase Agreement describes the Blissfield Wind Project as the "wind project under development in Lenawee County" and that the parties, "at the time of negotiating and executing the agreement[,] intended the Blissfield Wind Project to be developed in Lenawee County and did not anticipate . . . that it would be moved," Deere contends that there is "nothing in the Purchase Agreement that prevented the Blissfield Wind Project from being moved outside of Lenawee County."[13]

In Exelon's view, the Blissfield Wind Project was not moveable—it was a wind farm development in Lenawee County that Exelon reasonably abandoned in

---

[12] App. A319.
[13] Compl. ¶ 45.

8

favor of another development. In other words, the Blissfield Wind Project was, as the Purchase Agreement says, "the wind project under development in Lenawee County, Michigan," and whether the Beebe Wind Farm achieved the Purchase Agreement's development milestones is of no consequence because it is not that same wind project.

III

A

"The proper construction of any contract . . . is purely a question of law,"[14] so we review questions of contract interpretation *de novo*.[15] Our objective is to determine the intent of the parties from the language of the contract.[16] This inquiry should focus on the parties' shared expectations at the time they contracted,[17] but because Delaware adheres to an objective theory of contracts, the "contract's construction should be that which would be understood by an objective, reasonable third party."[18] If a contract is unambiguous, extrinsic evidence may not be used to

---

[14]    *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[15]    *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1231 (Del. 1997).

[16]    *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003).

[17]    *See Eagle Industries*, 702 A.2d at 1233 n.11 (recognizing that the parties' intent must be gauged "*at the time they entered into the contract*").

[18]    *Salamone v. Gordon*, 106 A.3d 354, 367–68 (Del. 2014) (quoting *Osborn ex. rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

9

interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity."[19]

B

We begin with the Purchase Agreement's plain language. Exelon's obligation to pay Deere an earn-out for the Blissfield Wind Project was contingent upon "the Blissfield Wind Project achiev[ing] Completion of Development and Commencement of Construction." The "Blissfield Wind Project" is defined by the Agreement to mean "the wind project under development in Lenawee County, Michigan, by Blissfield Wind Energy, LLC, with a nameplate capacity of 81 megawatts." Together, then, payment of the earn-out was contingent upon "the wind project under development in Lenawee County, Michigan," achieving "Completion of Development and Commencement of Construction."

On its face that presents a problem for Deere, because there is no dispute that the wind project in Lenawee County neither completed development nor commenced construction—civic opposition saw to that. But Deere believes the key lies in the definition of the term "Completion of Development and Commencement of Construction." Under the Agreement, a "Completion of Development and Commencement of Construction" could be triggered in one of two ways. The first is

---

[19]     *Eagle Industries*, 702 A.2d at 1232.

10

the achievement of five development milestones that are spelled out in the Agreement.[20] The second is the reaching of a "Commercial Operation Date." It is this second trigger that forms the basis of Deere's argument.

"Commercial Operation Date" is yet another defined term—the Agreement explains that this term "has, with respect to any Michigan Wind Project, the meaning set forth in the Michigan PPA related to such Michigan Wind Project." Exelon purchased three "Michigan Wind Projects" from Deere, the Blissfield Wind Project being one of them, so to find the meaning of "Commercial Operation Date" as it applies to the Blissfield Wind Project, the Agreement directs us to the "meaning set forth in the Michigan PPA related to" the Blissfield Wind Project. "Michigan PPA," too, is a defined term, and it refers to three different contracts, one of which is "that certain Renewable Energy Purchase Agreement, dated as of June 21, 2010 (as amended, restated, modified, superseded or supplemented from time to time), between Consumers Energy Company and Blissfield Wind Energy, LLC." That is the PPA that, at least as of the date of the sale, related to the wind project under development in Lenawee County. And sure enough, the PPA contains the term

---

[20] Those five milestones are (1) securing relevant permits, (2) securing turbine supply agreements, (3) securing interconnection agreements, (4) having a Power Purchase Agreement in place, and (5) commencement of on-site construction of roads and foundations and completion of initial wind turbine construction.

"Commercial Operation Date," and it refers to the date on which a number of development milestones listed in the PPA are met.

Exelon, as mentioned, was able to persuade Consumers Energy to transfer the PPA to the Beebe Wind Farm once the Lenawee County site proved politically infeasible. To do so required an amendment to the PPA because the PPA made various references to the term "Plant Site," which the PPA had defined as "[t]he site upon which the Plant will be located in Lenawee County, Michigan."[21] So the two sides amended that definition to strike "Lenawee County" and replace it with "Ionia or Gratiot County"—the latter of which being where the Beebe Wind Farm was under development. And there is no dispute that Exelon ultimately succeeded in achieving a "Commercial Operation Date" at the Beebe site, as that term is defined in the PPA, by reaching the milestones listed in the PPA.

The crux of Deere's argument—which the Superior Court accepted—is that the achievement of a Commercial Operation Date under the amended PPA automatically triggered the earn-out payment under the Purchase Agreement. To be sure, this argument has some superficial appeal. The Purchase Agreement states that the earn-out is triggered upon the "Completion of Development and Commencement of Construction," and one way that could occur is by the achievement of a Commercial Operation Date, as it is defined under the PPA. So, the argument goes,

---

[21]    App. A239.

12

the achievement of a Commercial Operation Date under the amended version of the PPA must have triggered the earn-out under the Purchase Agreement.

But Deere's argument glosses over textual difficulties that arise when the interlocking terms in the earn-out provision are read together. As explained, the earn-out payment was contingent upon "the Blissfield Wind Project achiev[ing] Completion of Development and Commencement of Construction." Fully unpacked, that means that payment was contingent upon "the wind project under development in Lenawee County, Michigan achiev[ing]" either the five milestones specified in the Purchase Agreement or the milestones "set forth in the Michigan PPA related to . . . ['the wind project under development in Lenawee, County, Michigan']." Although it is true that the milestones set forth in the PPA were achieved, at the time they were achieved the PPA was no longer "related to . . . ['the wind project under development in Lenawee County, Michigan']"—it had been amended to relate to the Beebe Wind Farm. And even if the PPA, post-amendment, still "related to" the Lenawee County project by virtue of the fact that it was the same agreement that, at one time, had related to that development, the earn-out was due only if "the wind project under development in Lenawee County, Michigan, achiev[ed]" the milestones in the PPA. But it was not that wind project that achieved the milestones—it was the Beebe Wind Farm, in Gratiot County.

13

IV

Deere's answer to this interpretive problem is that the Purchase Agreement's description of the Blissfield Wind Project as the "wind project under development in Lenawee County, Michigan," was not intended to give the term "wind project" a geographic component—it was just an easy way to distinguish that project at the time of the sale from the numerous other wind projects that Exelon purchased from Deere. So to Deere, it is not incongruous to say that when the Beebe Wind Farm, in Gratiot County, achieved a Commercial Operation Date, that meant, in the language of the Purchase Agreement, that "the wind project under development in Lenawee County, Michigan," achieved Completion of Development and Commencement of Construction." The Beebe Wind Farm was still the same "wind project"—it had just been moved from Lenawee County to the Beebe site in Gratiot County.

But even granting Deere the argument that the phrase "under development in Lenawee County" was intended only to identify the "wind project"—not define it—the question still remains whether the Beebe Wind Farm could, in the meaning of the Purchase Agreement, be the same "wind project" that was once under development in Lenawee County, and for which Exelon agreed to assume an earn-out obligation.

14

There is no dispute that the PPA is the only common thread between the wind farm that was under development in Lenawee County and the Beebe Wind Farm that Exelon acquired from Nordex.[22] Deere's argument, then, would collapse the "wind project" into nothing more than an *idea* for a wind farm and a single intangible asset, untethered in any way to the development that had already begun in Lenawee County. But a number of provisions in the Purchase Agreement belie the notion that the parties intended for the "wind project" to have so fluid a meaning that Exelon's earn-out obligation could be triggered by its re-use of a single intangible asset from the Lenawee County development at a wholly separate wind farm—even an intangible asset as valuable as a PPA.

Most telling are the representations that Deere made to Exelon about the status of the development at the time of the sale. Deere represented that Blissfield Wind Energy, the Deere subsidiary that was developing the project, was "targeting the acquisition of real property interests" that, "together with the real property interests already held" by the company, "would . . . constitute all of the real property interests necessary to develop, construct, own, operate, maintain and use the Blissfield Wind

---

[22] Deere points out that there is one other connection: Exelon acquired the Beebe Wind Farm from Nordex through the same legal entity—Blissfield Wind Energy, LLC—that Exelon purchased an interest in from Deere and that had been developing the wind farm in Lenawee County. But whatever the "wind project" is, Blissfield Wind Energy is not part of it—it owns it.

Project."[23] A map in one of the schedules to the Purchase Agreement shows the locations of plots of land in Lenawee County that were already under lease at the time of the sale, as well as the proposed locations for approximately forty-five wind turbines.[24] The map reveals that Blissfield had already leased land for more than half of the turbines and was targeting the land needed for another third of them.

Deere also represented that it was "continuing to obtain the Permits necessary to develop, construct, own, maintain, use and operate" the Blissfield Wind Project and that it "reasonably believe[d] that all material Permits . . . [could] be obtained in the ordinary course"[25] (with the cautionary note that "resistance to the Blissfield Wind Project in [the] township" could "possibly" lead to a restrictive ordinance[26]).

So whatever the precise contours of this "wind project" that Exelon acquired, we can safely say that it was more than just an idea for a wind farm and a PPA looking for a home. The project already had a real-property footprint in Lenawee County, and Exelon had in hand the twin representations from Deere that "no material impediment exist[ed] to obtaining the [remaining] real property interests" and that there was a path (so it seemed at the time) toward obtaining the permits for the wind farm to operate in Lenawee County.[27]

---

23     App. A335–36.
24     App. A453.
25     App. A336.
26     App. A454.
27     App. A336.

## B

The representations that Deere made about the suitability of the Lenawee County site do more than just demonstrate that the "wind project" had a geographic anchor at the time of the sale—these representations were essential to Exelon's willingness to assume the earn-out obligation.

At the time of the sale, Deere's wind energy business included over a dozen wind projects that were under development, but Exelon agreed to make earn-out payments for only three of them: the three Michigan Wind Projects. And those three projects are the only projects for which Deere made representations that the real property and permits necessary for development to succeed at the sites Deere had chosen for each Project were either already secured or attainable.

That was no coincidence. When a buyer like Exelon agrees in advance to make an earn-out payment for a fixed dollar amount, the buyer needs to assure itself that the amount it will have to expend to achieve the earn-out-triggering conditions will not rise to the point that the earn-out payment will end up out of proportion with the project's value. For a project like a wind-farm development, two obvious areas where costs could spiral are the acquisition of the land necessary to complete the development and the securing of the necessary approvals from government authorities. Unexpected impediments on either of those fronts—like holdout landowners or stubborn municipalities—could quickly escalate the cost of bringing

the wind farm to fruition, eroding the project's profitability and distorting the relationship between the value of the project and the fixed earn-out payment.

So it is unsurprising that in exchange for the Exelon's willingness to agree in advance to a $14 million earn-out payment for the successful development of the Blissfield Wind Project—before knowing how much it would cost to get there—Exelon would insist on some assurances about the suitability of the site Deere had chosen. And Deere obliged by representing that, to its knowledge, there was "no material impediment . . . to obtaining the [remaining] real property interests" at the Lenawee County site and that "all material Permits necessary for the development" of the project at that site could "be obtained in the ordinary course."[28] Those representations gave Exelon some comfort that Deere was not trying to offload a wind development at serious risk for cost overruns in exchange for a fixed payout that was out of line with the development's value.

But to accept Deere's interpretation, we would have to believe that after securing those representations about the Lenawee County site, Exelon was nonetheless willing to commit itself to paying the earn-out if it were able to bring a wind farm to operation anywhere, as long as it made use of the PPA. And that would upend the Purchase Agreement's balance between the fixed earn-out payment that Deere demanded, and Deere's assurances that it knew of no material obstacles in the

---

[28]     App. A336.

18

way of land or permit acquisitions at the Lenawee County site that could swell development costs and swing the project's value out of line with the amount of the earn-out.

C

Together, these provisions in the Purchase Agreement make implausible the notion that a different wind farm, situated in a different location and regulatory environment (and acquired from another company, no less), was the same "wind project" that had been under development in Lenawee County, simply because Exelon was able to persuade Consumers Energy to transfer the PPA there. And aside from the PPA being the only link between the two developments, that link was attenuated by Consumers' demand that, in exchange for transferring the PPA to the Beebe Wind Farm, Exelon assume the risk that Consumers could lose its tax credits if the development were not completed in time.

When Exelon first approached Consumers with the idea of amending the PPA to move it to a new development, Consumers resisted, telling Exelon that if it was unable to complete development in Lenawee County, then Consumers preferred "to go out for a rebid."[29] Although Consumers did not foreclose the idea of transferring the PPA to a new project, it emphasized that its highest priority was that "the

---

[29]    App. A528.

19

replacement project . . . be built in 2012."[30] Missing the 2012 completion date would put an estimated $16 million in tax credits that Consumers was set to receive at risk—a risk that Consumers had to bear under the terms of the PPA as Consumers and Deere had negotiated them. To secure Consumers' consent to move the PPA to the Beebe Wind Farm, Exelon agreed to take on this risk.[31]

So while Exelon succeeded in finding a way to save the PPA after community opposition doomed the Lenawee County development, the PPA ended up being on different terms than Deere had negotiated before the sale, and that further reduces the little the two developments have in common.

### D

The Superior Court offered two reasons why the "wind project" that Exelon purchased from Deere could be—and was—moved to the Beebe Wind Farm.

The first turned on the amendment the parties made to the PPA to strike the reference to "Lenawee County" and replace it with "Ionia or Gratiot County." In the Superior Court's view, that "amendment . . . reflect[ed] the ability of Exelon to change the project location."[32]

---

[30] App. A529.

[31] As the Beebe Wind Project was in fact completed in 2012, the risk did not materialize, but that does not mean that Exelon's assumption of this risk did not work a material change to the terms of the PPA as they stood when Exelon acquired Deere's rights to it.

[32] 2016 WL 3546921, at *5 (Del. Super. Ct. June 2, 2016).

But that reasoning—that Exelon's success in amending the PPA showed that Exelon could move the wind project—begs the very question that must be answered: is amending the PPA tantamount to moving the project? All that the amendment of the PPA established was that the PPA could be used for a different development. It does not automatically follow that using the PPA for a different development meant that Exelon had also moved the "wind project," as that term is used in the Purchase Agreement, or, more to the point, that the wind project consisted of just an idea for a wind farm and the PPA, which both could be freely moved to another site with a simple amendment to the PPA.

The Superior Court was of the view that the Purchase Agreement's concept of the "wind project" had to travel with the PPA because the Purchase Agreement incorporates the milestones from the PPA as one of the two triggers for the earn-out payment. So if the "wind project" in the Purchase Agreement were not harmonized with the project in the PPA, the "Purchase Agreement [could not] be given its full meaning."[33] But that is not so.

---

[33] *See id.* In the course of its discussion, the Superior Court opined that "[t]he Blissfield PPA is incorporated by reference into the purchase agreement." *Id.* Not just the term "Commercial Operation Date," which the Purchase Agreement does expressly incorporate, but the entire PPA. Why the Superior Court needed to reach that conclusion we cannot say, because the only part of the PPA that the Superior Court found relevant—the amendment the parties made to the term "Plant Site" by changing "Lenawee County" to "Ionia or Gratiot County"—is incorporated into the PPA's definition of "Commercial Operation Date" (through a sort of roundabout reference to the term "Plant," which in turn references the term "Plant Site"). So there was no need to contemplate whether the Purchase Agreement incorporated any other parts of the PPA, or the rest of it entirely. And to the extent the Superior Court believed that the incorporation of a discrete

21

As explained, the Purchase Agreement provides that the earn-out would be triggered if "the Blissfield Wind Project achieves Completion of Development and Commencement of Construction," which, with its defined terms fully expanded, means that the payment would be due if "the wind project under development in Lenawee County, Michigan achieves" either the five milestones specified in the Purchase Agreement or the milestones "set forth in the Michigan PPA related to . . . ['the wind project under development in Lenawee, County, Michigan']." If the PPA were transferred to a different wind farm development, separating the PPA from the development in Lenawee County, that would not create an interpretive disconnect between the Purchase Agreement and its incorporation of the PPA's milestones—it would simply mean that "the wind project under development in Lenawee County" would not be able to achieve those milestones.[34]

---

term or two from another contract necessarily means that the entire contract has been incorporated, we disagree. *See* 11 Richard A. Lord, *Williston on Contracts* § 30:25, at 234, 238 (4th ed. 1999) ("It is not necessary to refer to or incorporate the entire document; if the parties so desire, they may incorporate a portion of the document. . . . While discussion of incorporation by reference is often framed in terms which suggest the complete absorption of one document into another, it is important to note that when incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for that purpose only, and should be treated as irrelevant for all other purposes.").

[34] Our understanding that a transfer of the PPA to a different wind farm development would end any chance that Blissfield Wind Project could meet the PPA's milestones, which constitute one of the two triggers for the earn-out, does not leave the Purchase Agreement vulnerable to earn-out-avoiding gamesmanship. The Purchase Agreement required Exelon to "us[e] all commercially reasonable efforts and Prudent Industry Practices to . . . complete development and commence construction" on Blissfield Wind Project "such that [the Project] would . . . achieve commercial operation by the . . . Commercial Operation Milestone Date" in the PPA, App. A319, so only in scenarios such as this one, where some unexpected occurrence (like a hostile municipality) rendered it commercially unreasonable to continue development at the Lenawee County site, could

The second reason the Superior Court offered was its view that Exelon's "actions and representations at the time it was seeking to amend the Blissfield PPA" showed that Exelon itself believed that the "wind project" was something it could move to another site. Among the evidence the court seized upon was the force majeure letter that Exelon sent to Consumers Energy shortly after the restrictive ordinance was passed in Riga Township, in which Exelon told Consumers that "[t]he Force Majeure event [would] continue unless and until these new regulations are repealed . . . or *the Project is moved to an alternate location.*"[35] Exelon spoke in similar terms to Consumers in a second letter sent shortly thereafter, in which it told Consumers that it "ha[d] identified a *possible alternative site for the Project* in a nearby county within Michigan and is currently assessing the feasibility of moving the Project to this location."[36] But, of course, these letters do not mean that the Beebe Wind Farm was "the wind project under development in Lenawee County, Michigan" for purposes of the Purchase Agreement, to which Consumers was not a party. They simply recognize that Exelon was hopeful it could identify a substitute site that—with Consumers' consent—could fulfill the role that the Blissfield Wind Project was supposed to play, but could not, under the PPA. And Exelon also

___

Exelon have moved the PPA and abandoned the Lenawee County development. And the notion that Exelon might be trying to game the earn-out provision is undermined by the fact that it willingly paid Deere earn-out payments for its successful development of the other two Michigan Wind Projects.

[35]     App. A531 (emphasis added).
[36]     App. B178 (emphasis added).

23

apparently included a line item for the $14 million earn-out payment to Deere in one of its internal valuations of the Beebe Wind Farm, which the Superior Court interpreted as suggesting that Exelon—or at least someone in its finance department—believed that the "wind project" was moveable. But this document may simply reflect that there was a risk Deere would argue that the Beebe Wind Farm counted, which Exelon believed was prudent to factor into its decision making.[37]

The questionable value of these documents aside, what is important is that they are all parol evidence. Extrinsic evidence like this cannot be used "to interpret the intent of the parties" or "to vary the terms of the contract" unless the contract suffers from some ambiguity.[38] But the Superior Court concluded—and we agree—that "[t]he Purchase Agreement is unambiguous in its terms relevant to this case."[39] So why the parol evidence? The Superior Court believed that when a contract contains an earn-out provision, a court is allowed to consult "post-closing events and circumstances" to "resolve the parties' rights and obligations under the contract."[40] That was error.

The Superior Court said that when a dispute arises over a party's entitlement to a contractual earn-out payment, "it [is] necessary for the [court] to examine the

---

[37] *See also* App. A530 (Deere internal email confirming Deere's intent to write off the earn-out connected to the Blissfield Wind Project).
[38] *Eagle Industries*, 702 A.2d at 1232.
[39] 2016 WL 3546921, at *6.
[40] *See id.*

24

post-closing conduct of the parties" to "determine whether the seller [is] entitled to the earn-out."[41] That is true enough. But it stands for nothing more than the obvious: when a party to a contract claims that the other breached (such as by failing to pay an earn-out that was allegedly due), whether a breach has occurred depends upon what the parties did (or did not do) after the contract was formed. That evidence cannot be used, as the Superior Court did here, as an aid to interpreting the meaning of the contract. So although the parties' post-closing conduct is essential to determining whether the Beebe Wind Farm met the Purchase Agreement's definition of the "wind project under development in Lenawee County, Michigan," and, if so, whether the Beebe Wind Farm achieved the earn-out triggering milestones, it cannot—absent an ambiguity that the Superior Court did not identify—be used to determine what the parties meant by "the wind farm under development in Lenawee County, Michigan," and whether they understood it to be tethered to Lenawee County.

---

41      *Id.*

25

## V

For the foregoing reasons, the Superior Court's grant of summary judgment in favor of Deere is reversed, and this case is remanded with instructions to enter judgment in favor of Exelon.[42]

---

[42] In light of our conclusion that Exelon does not owe the earn-out payment, we need not address the Superior Court's rejection of the affirmative defenses that Exelon raised in the hopes of defraying some or all of that payment.