IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE SAMUEL J. HEYMAN 1981 | § | |
| CONTINUING TRUST FOR LAZARUS S. | § | No. 279, 2021 |
| HEYMAN; THE SAMUEL J. HEYMAN 1981 | § | |
| CONTINUING TRUST FOR ELEANOR S. | § | Court Below: Superior Court |
| HEYMAN; THE SAMUEL J. HEYMAN 1981 | § | of the State of Delaware |
| CON-TINUING TRUST FOR JENNIFER L. | § | |
| HEYMAN; THE SAMUEL J. HEYMAN 1981 | § | C.A. No. N15C-10-176 |
| CONTINUING TRUST FOR ELIZABETH D. | § | |
| HEYMAN; THE LAZARUS S. HEYMAN AGE | § | |
| 50 TRUST FOR ASSETS APPOINTED | § | |
| UNDER WILL OF LAZARUS S. HEYMAN; | § | |
| THE ELEANOR S. HEYMAN AGE 50 TRUST | § | |
| FOR ASSETS APPOINTED UNDER WILL OF | § | |
| LAZARUS S. HEYMAN; THE JENNIFER L. | § | |
| HEYMAN AGE 50 TRUST FOR ASSETS | § | |
| APPOINTED UNDER WILL OF LAZARUS S. | § | |
| HEYMAN; THE ELIZABETH D. HEYMAN | § | |
| AGE 50 TRUST FOR ASSETS APPOINTED | § | |
| UNDER WILL OF LAZARUS S. HEYMAN; | § | |
| THE HORIZON HOLDINGS RESIDUAL | § | |
| TRUST; RFH INVESTMENT HOLDINGS | § | |
| LLC; THE 2013 SAMUEL J. HEYMAN 1981 | § | |
| CONTINUING TRUST FOR LAZARUS S. | § | |
| HEYMAN; THE 2013 SAMUEL J. HEYMAN | § | |
| 1981 CONTINUING TRUST FOR ELEANOR | § | |
| HEYMAN PROPP; THE 2013 SAMUEL J. | § | |
| HEYMAN 1981 CONTINUING TRUST FOR | § | |
| JENNIFER HEYMAN MILLSTONE; THE | § | |
| 2013 SAMUEL J. HEYMAN 1981 | § | |
| CONTINUING TRUST FOR ELIZABETH | § | |
| HEYMAN WINTER; THE 2013 LAZARUS S. | § | |
| HEYMAN AGE 50 TRUST FOR ASSETS | § | |
| APPOINTED UNDER WILL OF LAZARUS S. | § | |
| HEYMAN; THE 2013 ELEANOR HEYMAN | § | |
| PROPP AGE 50 TRUST FOR ASSETS | § | |
| APPOINTED WILL OF LAZARUS S. | § | |
| HEYMAN; THE 2013 JENNIFER HEYMAN | § | |
| MILLSTONE AGE 50 TRUST FOR ASSETS | § | |

APPOINTED UNDER WILL OF LAZARUS S. §
HEYMAN; THE 2013 ELIZABETH HEYMAN §
WINTER AGE 50 TRUST FOR ASSETS §
APPOINTED UNDER WILL OF LAZARUS S. §
HEYMAN; THE 2015 HORIZON HOLDINGS §
RESIDUAL TRUST FOR LAZARUS S. §
HEYMAN; THE 2015 HORIZON HOLDINGS §
RESIDUAL TRUST FOR ELEANOR §
HEYMAN PROPP; THE 2015 HORIZON §
HOLDINGS RESIDUAL TRUST FOR §
JENNIFER HEYMAN MILLSTONE; THE §
2015 HORIZON HOLDINGS RESIDUAL §
TRUST FOR ELIZABETH HEYMAN §
WINTER; and LINDEN PROPERTY §
HOLDINGS LLC, §
§
      Defendants Below, §
      Appellants/Cross-Appellees, §
§
      v. §
§
ASHLAND LLC, INTERNATIONAL §
SPECIALTY PRODUCTS INC., ISP §
ENVIRONMENTAL SERVICES INC., and §
ISP CHEMCO LLC, §
§
      Plaintiffs Below, §
      Appellees/Cross-Appellants. §

Submitted: June 22, 2022
Decided: September 12, 2022

Before **SEITZ,** Chief Justice; **VAUGHN** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED AND REMANDED.**

William M. Lafferty, Esquire, Miranda N. Gilbert, Esquire, John P. DiTomo, Esquire, Lauren N. Bennett, Esquire, Thomas P. Will, Esquire, Morris Nichols Arsht & Tunnell LLP, Wilmington, Delaware; Robert N. Hochman, Esquire, Heather Benzmiller Sultanian, Esquire, Sidley Austin LLP, Chicago, Illinois; Eamon P. Joyce, Esquire, Sidley Austin LLP, New York, New York; Andrew J. Rossman, Esquire (*Argued*), Jonathon B. Oblak, Esquire, Nicholas Hoy, Esquire, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, *for Defendants-Below, Appellants.*

Christopher Viceconte, Esquire, Gibbons, P.C., Wilmington; Jennifer A. Hradil, Esquire (*Argued*), William S. Hatfield, Esquire, Camille V. Otero, Esquire, Joshua R. Elias, Esquire, Gibbons, P.C., Newark, New Jersey, for *Plaintiffs-Below; Appellees.*

**VAUGHN**, Justice:

This is a breach-of-contract dispute involving a stock purchase agreement for the sale of all the shares of stock of International Specialty Products Inc. ("International Specialty"). The selling shareholders were nine trusts and RFH Investment Holdings LLC, all of whom are Appellants in this appeal (the "Heyman Parties").[1] The purchaser was Appellee Ashland Inc. ("Ashland"), a leading global specialty chemical company. International Specialty had two wholly owned subsidiaries that went with the sale, Appellee ISP Environmental Services Inc. ("ISP Environmental") and Appellee Chemco LLC ("Chemco").[2] ISP Environmental owned a property known as the Linden property, which for years had been home to chemical manufacturing operations and had an extensive environmental history. As part of the transaction, the parties agreed that the Heyman Parties would keep the Linden property. Accordingly, at the time of closing on the Stock Purchase Agreement, ISP Environmental caused the Linden property to be transferred to Appellant Linden Property Holdings LLC ("Linden Property Holdings"), the Heyman Parties' designated entity for that purpose.

A dispute has now arisen between the parties as to who is responsible for the

---

[1] At the time of the filing of the complaint, the nine seller trusts had distributed all of their assets and liabilities to twelve successor trusts, all of which are Appellants. The phrase "Heyman Parties" will be used to refer to the Appellants without distinguishing among them, unless the context requires specificity.

[2] "Ashland" will be used to refer to Ashland, Inc. and to Ashland, Inc., International Specialty, ISP Environmental, and Chemco collectively without distinguishing among them, unless the context requires specificity.

4

Linden property's pre-closing, environmental liabilities. The parties agree that the Heyman Parties assumed responsibility in the agreement for the Linden property's on-site environmental liabilities, that is, liability for environmental contamination on the property itself. They disagree as to who is responsible for the Linden property's off-site environmental liabilities, that is, liability for environmental contamination to areas that are not part of the Linden property but are contaminated because of the activities on the Linden property. Ashland claims that under the agreement, the Heyman Parties are responsible for the off-site environmental liabilities as well as the on-site liabilities. The Heyman Parties claim that they never assumed any liability in the agreement for the off-site liabilities. The Superior Court agreed with Ashland and found that the Heyman Parties assumed responsibility in the agreement for the Linden property's off-site environmental liabilities. We have concluded, however, that under the unambiguous language of the agreement, the Heyman Parties assumed liability only for the Linden property's on-site environmental liabilities, and the Heyman Parties did not assume any liability in the agreement for the property's off-site liabilities.

**FACTS AND PROCEDURAL HISTORY**

**I. History of the Linden Property and Its Environmental Liabilities**

From 1919 to 1991, International Specialty's predecessors, nonparties GAF Corporation and GAF Chemicals Corporation (collectively "GAF"), owned and

operated the Linden property as a home to chemical manufacturing operations. During the 1970s-1980s, GAF discovered contamination at the Linden property. The Heyman Parties acquired GAF in the 1980s. In June 1989, the New Jersey Department of Environmental Protection ("NJDEP") and GAF entered into an Administrative Consent Order. The Administrative Consent Order required GAF to remediate "any and all pollution at the site, emanating from the site, or which has emanated from the site."[3] The Administrative Consent Order identified both on-site and off-site contamination that GAF was responsible for remediating.

Once manufacturing operations ceased at the Linden property in 1991, ISP Environmental became the owner of the Linden property and assumed all its liabilities, including those related to the Administrative Consent Order. In 2003, the NJDEP approved an on-site Remedial Action Workplan for the Linden property. When the remediation under the Workplan was complete, NJDEP issued "No Further Action" letters certifying that on-site remediation was complete, and no future action would be taken against ISP Environmental or any successor owners of the Linden property for the on-site remediation ISP Environmental had completed.

In June 2007, NJDEP filed a complaint against ISP Environmental for failure to fulfill its off-site remedial obligations at the Arthur Kill and Piles Creek waterways. These areas are off-site Linden property liabilities. In June 2011, ISP

---

[3] App. to Opening Br. at A794.

Environmental and NJDEP entered into a Consent Judgment that dismissed the claims relating to Piles Creek with prejudice but preserved the claims relating to the Arthur Kill waterway. Therefore, off-site remediation under the Administrative Consent Order remained open and the NJDEP could still require clean-up of the Arthur Kill area.

## II. Ashland's Purchase of ISP and the SPA

In 2010, Ashland began considering an acquisition of International Specialty, and by February 2011, Ashland and the Heyman Parties had a tentative deal for Ashland to acquire 100% of the shares of stock of International Specialty for $3.3 billion. After engaging in due diligence, Ashland reduced its offer to $2.75 billion. The Heyman Parties rejected the revised offer and held to the $3.3 billion figure.

In May 2011, Ashland and the Heyman Parties came to an agreement: Ashland would purchase 100% of International Specialty's stock for $3.2 billion. In exchange for the $100 million price reduction from $3.3 billion, the parties agreed that immediately after closing, ISP Environmental would transfer the Linden property and another site in Wayne, New Jersey back to entities designated by the Heyman Parties.[4] Linden Property Holdings was the designee for the Linden property.

The Stock Purchase Agreement was executed on May 30, 2011, and closed

---

[4] The Wayne property is not involved in this litigation.

on August 23, 2011. Transfer of the Linden property from ISP Environmental to the

Heyman Parties' entity is addressed in Schedule 5.19 Section 2 of the agreement.

Section 2(e) describes the Linden property liabilities being assumed by the Heyman

Parties. It states, in pertinent part:

> In connection with the Linden Transfer, [the Heyman Parties] shall assume all Liabilities to the extent related to or arising from or existing at the Linden Property, including Liabilities arising under or relating to (i) Environmental Laws, provided that such Liabilities shall not include any off-site migration or disposal of Hazardous Materials from the Linden Property prior to the Closing, any claims or damages associated with any off-site migration or disposal of Hazardous Material from the Linden Property prior to the Closing, and for the avoidance of doubt, any off-site contamination of soils, groundwater or sediments, any third party superfund sites including the Newark Bay Complex, any natural resources damages or exposure claims relating to operations or discharges prior to Closing . . . (the "Linden Excluded Liabilities").[5]

Section 2(f) of Schedule 5.19 then provides:

> In connection with the Linden Transfer, the Seller Parties shall be responsible, at their sole cost and expense, for compliance, if applicable, with any requirements of the Industrial Site Recovery Act ("ISRA") and, if ISRA applies to the Linden Transfer, [the Heyman Parties] shall (i) within five (5) Business Days after execution of this Agreement, make any required filings or notifications (such as a General Information Notice, as defined under ISRA) to the New Jersey Department of Environmental Protection ("NJDEP"), and (ii) use reasonable best efforts to, prior to closing, make all other filings, undertake all

---

[5] App. to Opening Br. at A908.

8

other measures, including where required undertaking any site investigation or Remedial Action required by ISRA. In addition, [the Heyman Parties] shall use reasonable best efforts to amend any consent decree or other binding agreement with any Governmental Entity relating to the Linden Excluded Liabilities, and to replace or substitute any related financial assurance (including any bond or letter of credit), to include the name of the [Heyman Parties' designee] following the Linden Transfer and, if permitted by NJDEP, to remove the name of [International Specialty or any of its affiliates] therefrom.[6]

The dispute between the parties involves the proper construction of the second sentence of Section 2(f).

Schedule 5.19 Section 4 of the Stock Purchase Agreement also provides Ashland and its affiliates with indemnification for losses related to the Linden Excluded Liabilities. Specifically, it requires the Heyman Parties to indemnify Ashland and its affiliates "from and against any and all Losses actually suffered or incurred . . . to the extent arising out of . . . the Linden Excluded Liabilities."[7] There is no corresponding provision in which Ashland agreed to indemnify the Heyman Parties or their designated Linden property transferee for any losses related to Linden property off-site liabilities.

The actual transfer of the Linden property was executed through a Contribution Agreement on August 23, 2011, the same day the Stock Purchase

---

[6] *Id*.
[7] *Id*. at A909.

9

Agreement closed. This is the only agreement signed by Linden Property Holdings.

The Contribution Agreement defines liabilities being assumed by Linden Property

Holdings with substantially the same language as appears in Section 2(e). It provides

that liabilities assumed by Linden Property Holdings

> shall not include any off-site migration . . . of Hazardous
> Materials from the Linden Property prior to the Closing,
> any claims or damages associated with any off-site
> migration . . . of Hazardous Material from the Linden
> Property prior to the Closing, and for the avoidance of
> doubt, any off-site contamination of soils, groundwater or
> sediments.[8]

The Contribution Agreement does not include an analog to Section 2(f).

### III. Actions After the Acquisition

Pursuant to its obligations under Section 2(f), in 2011, the Heyman Parties

replaced certain financial assurances required by the Administrative Consent Order

as guarantees for ongoing cleanups with a $7,744,000 letter of credit issued on behalf

of Linden Property Holdings for operation and maintenance costs for the Linden

property. They also obtained the release of the original financial assurances, which

had been posted by Chemco.[9] There is a dispute between the parties as to whether

---

[8] *Id*. at A1206.

[9] The $7,744,000 letter of credit remained in place until 2015. Linden Properties Holding informed NJDEP of is intent to terminate the letter of credit and ultimately posted a smaller amount. That smaller letter of credit has been terminated. The Superior Court found that because Linden Property Holdings has no longer posted financial assurances, the Heyman Parties have violated Section 2(f). Whether the Heyman Parties have violated the agreement on this point as found by the Superior Court, and what, if any, damages Ashland might have sustained as a result thereof, are beyond the scope of this appeal. The Superior Court also found that the Heyman Parties

the letter of credit covered *all* remediation requirements of the Administrative Consent Order or merely Linden Property Holdings' on-site obligations.

In 2012, at the request of a potential Linden property purchaser, the Heyman Parties attempted to terminate the Administrative Consent Order. The NJDEP rejected the request, explaining that the Administrative Consent Order carried obligations related to Arthur Kill waterway that had not been resolved by the 2011 Consent Judgement.

## IV. Procedural History

On October 20, 2015, Ashland, International Specialty, ISP Environmental, and Chemco sued the Heyman Parties in the Superior Court. Count I of the complaint alleged that under the terms of the Stock Purchase Agreement, the Heyman Parties assumed liability for environmental investigation and remediation of the Linden property under the Administrative Consent Order and New Jersey law, including both on-site and off-site contamination. It alleged that the Heyman Parties had breached their obligation by failing to perform remediation of the Arthur Kill waterway.

Both parties filed motions for judgment on the pleadings. In rejecting both

---

violated Section 2(f) when it did not make best efforts to amend the Administrative Consent Order to add Linden Property Holding or remove International Specialty. Whether the Heyman Parties violated this provision of Section 2(f) and what, if any, damages Ashland might have sustained as a result thereof are also beyond the scope of this appeal.

11

motions, the Superior Court held that "at this stage of the proceedings, the Court is not comfortable that there are not ambiguities in the [Stock Purchase Agreement]."[10] The Court noted that Section 2(e)'s "all-encompassing" language "allocated pre-closing off-site liabilities to Ashland."[11]  However, the court went on to explain that reading 2(e) and 2(f) together, one could construe the Stock Purchase Agreement as allocating to the Heyman Parties off-site liabilities "relating to the [Administrative Consent Order]," including liabilities because of contamination to the Arthur Kill waterway.[12]

After discovery, both parties moved for summary judgment.  The Superior Court held, "Now that the record has been developed, the Court is comfortable that Schedule 5.19, including Sections 2(e) and 2(f), is unambiguous and that the Heyman Defendants retained all liabilities relating to the Linden Property under the [Administrative Consent Order]."[13]  The court explained that as the more specific provision, the language of 2(f) prevails.  The specific responsibilities that the Heyman Parties undertook in Section 2(f), the court found, "qualifie[d] [Stock Purchase Agreement] Section 2(e)'s definition of Linden Excluded Liabilities to include certain off-site obligations under the [Administrative Consent Order]."[14]

---

[10] Opening Br. Ex. A at 10.
[11] *Id*. at 11.
[12] *Id.* at 12.
[13] Opening Br. Ex. D at 23.
[14] *Id*. at 31.

Section 2(f) obligates the Heyman Parties to "use reasonable best efforts to amend any consent decree . . . relating to the Linden Excluded Liabilities, and to replace or substitute any financial assurance . . . to include the name of the [Heyman Parties' designee] following the Linden Transfer and, if permitted by NJDEP, to remove the name of [International Specialty or any of its affiliates] therefrom."[15] Finding that the Administrative Consent Order was a consent decree, the Superior Court held that the language of Section 2(f) shifted all liabilities of the Administrative Consent Order to the Heyman Parties. The court then found that the Heyman Parties breached their obligation under 2(f) by failing to use best efforts to switch out the named party on the Administrative Consent Order.

The court also found that Schedule 5.19 Section 4(a) of the Stock Purchase Agreement, which requires the Heyman Parties to indemnify Ashland and its affiliates for any losses they sustained on account of the Linden Excluded Liabilities but does not require Ashland to indemnify the Heyman Parties or their Linden property designee for any losses sustained by them on account of off-site liabilities, supported its interpretation of Section 2(f). "This is contractually inconsistent with the idea that Ashland was responsible, even in part, under the [Administrative Consent Order] for actions taken by NJDEP under the [Administrative Consent

---

[15] App. to Opening Br. at A908.

Order] for on-site or off-site remediation."[16]   The court also looked to certain "background facts"[17] to make its ruling, including the fact that after closing, the Heyman Parties posted financial assurances for operation and maintenance of the Linden property–inferring that they took responsibility of all Administrative Consent Order liabilities.

In its ruling, the Superior Court declared that the Heyman Parties must indemnify Ashland, pursuant to Schedule 5.19 Section 4 and Section 7.2 of the Stock Purchase Agreement, for amounts Ashland or its affiliates have had to pay for off-site contamination stemming from the Linden property.  However, the court also found that Ashland was not entitled to recover attorneys' fees because the Stock Purchase Agreement did not clearly and unequivocally shift these fees to the Heyman Parties.

The Heyman Parties now appeal the Superior Court ruling and ask us to find that the Stock Purchase Agreement unambiguously carves out all off-site liabilities from its obligations and that Ashland is therefore not entitled to any indemnification. Ashland cross-appeals the Superior Court's determination that it is not entitled to attorneys' fees.

---

[16] Opening Br. Ex. D at 26.
[17] *Id*. at 22.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment and questions of contract interpretation *de novo*."[18]

## DISCUSSION

Delaware law "adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party."[19] "When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[20] Furthermore, "a court must determine the intent of the parties from the language of the contract."[21] This approach places great weight on the plain terms of a disputed contractual provision, and we "interpret clear and unambiguous terms according to their ordinary meaning."[22] Courts should also assure that "all contract provisions [are] harmonized and given effect where possible."[23] We do not consider extrinsic evidence unless we find that the text is ambiguous.[24] Ambiguity is present "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may

---

[18] *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014); *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013) (en banc).
[19] *Salamone*, 106 A.3d at 367-68.
[20] *Id.* at 368.
[21] *Id.*
[22] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).
[23] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 12-8. 1225 (Del. 2012).
[24] *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017).

have two or more different meanings."[25]  Critically, a contractual provision is "not rendered ambiguous simply because the parties in litigation differ" as to the proper interpretation.[26]

Both the Heyman Parties and Ashland claim to offer the plain, unambiguous reading of Schedule 5.19 Sections 2(e) and 2(f) of the Stock Purchase Agreement. The Heyman Parties argue that Section 2(e) explicitly states that they assumed only the Linden Excluded Liabilities–a defined term that "could not more clearly have excluded off-site liabilities from the transfer to [Linden Properties Holding]."[27] Section 2(f), they argue, can easily be harmonized with 2(e) "by simply restricting [the provisions] to their respective scopes: Section 2(e) substantively divides liabilities, and Section 2(f) identifies procedural consequences that follow from, but do not alter, that division."[28]

Ashland contends that under Section 2(f), the Heyman Parties are responsible for all Linden property liabilities relating to the Administrative Consent Order, both on-site and off-site. It contends that Section 2(f)'s requirement that the Heyman Parties "use reasonable best efforts to amend any consent decree . . . relating to the Linden Excluded Liabilities, and to replace or substitute any related financial

---

[25] *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).
[26] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).
[27] Opening Br. at 24.
[28] *Id*. at 28.

16

assurance . . . to include the name of the [Heyman Parties' designee] . . . and, if permitted by the NJDEP, to remove the name of [International Specialty or any of its affiliates] therefrom"[29] shifts all the obligations imposed by the Administrative Consent Order to the Heyman Parties and their designee, including the obligations for off-site remediation of the Arthur Kill waterway. In other words, Ashland asserts that "[i]t cannot be disputed that the consequence of fulfilling the intention of Section 2(f) would effectively leave [the Heyman Parties] and their designee as the only parties responsible for the obligations under the [Administrative Consent Order]."[30]

We cannot reconcile the interpretation that Ashland and the Superior Court give to these provisions with the plain language of their text. Sections 2(e) sets out the liabilities the Heyman Parties are assuming in connection with the Linden property. It begins by stating that the Heyman Parties assume all liabilities arising from the Linden property, but then unambiguously excludes all off-site liabilities. After so stating, it emphasizes the point by stating that "for the avoidance of doubt,"[31] the liabilities assumed by the Heyman parties do not include liabilities for off-site contamination. Section 2(e) then defines these on-site liabilities that the Heyman Parties are assuming as the "Linden Excluded Liabilities." It refers to the on-site liabilities as "excluded liabilities" because they are "excluded" from all the

---

[29] App. to Opening Br. at A908.
[30] Opening Br. at 27.
[31] App. to Opening Br. at A908.

liabilities of International Specialty and its subsidiaries—including off-site liabilities related to the Administrative Consent Order—that Ashland is indirectly taking in the transaction through its purchase of International Specialty's stock. The clear intent of the language is that the Heyman Parties are agreeing to assume only on-site liabilities.

Ashland does not take any serious issue with this reading of Section 2(e). Section 2(f) begins with a lengthy sentence involving New Jersey's Industrial Site Recovery Act ("ISRA"). It makes the Heyman Parties responsible for "compliance, if applicable, with any requirements of the [New Jersey ISRA]."[32] It provides that "if ISRA applies to the Linden Transfer"[33] the Heyman Parties shall, within five (5) Business Days after execution of this Agreement, make any required filings or notifications" to NJDEP, and "use reasonable best efforts to, prior to closing, make all other filings, undertake all other measures, including where required undertaking any site investigation or Remedial Action required by ISRA."[34] Ashland argues that Section 2(f)'s allocation of "all responsibility for compliance with the ISRA" to the Heyman Parties provides some support for its claim that the second sentence of Section 2(f) allocates all responsibility for compliance with the Administrative Consent Order to the Heyman Parties. However, the scope of compliance with the

---

[32] *Id.*
[33] *Id.*
[34] *Id.*

18

ISRA imposed on the Heyman Parties by Section 2(f), including whether it imposes any post-closing obligations at all, are undeveloped in the record. The first sentence of Section 2(f) is of no help in ascertaining the meaning of the second sentence.

The second sentence of Section 2(f) requires the Heyman Parties to use "reasonable best efforts" to accomplish several results. It does not directly address a division of liabilities. It does not directly add to, subtract from, or otherwise qualify the definition of "Linden Excluded Liabilities"—a definition which seems to have been set forth with considerable care in the preceding section. Ashland claims that the Administrative Consent Order liabilities are swept in by Section 2(f)'s mandate that Heyman use "reasonable best efforts to amend any consent decree . . . relating to the Linden Excluded Liabilities."[35] This approach to the second sentence would contradict Section 2(e)'s clear language. We conclude that Section 2(f) cannot be given the interpretation advocated by Ashland. Rather, the second sentence of Section 2(f) is one that is properly read as implementing the Heyman Parties' agreement to be responsible for the Linden Excluded Liabilities. It does so by requiring the Heyman Parties to use "reasonable best efforts" to take the steps described therein for the purpose of putting the Heyman Parties' designee in the place of International Specialty with regard to the Linden Excluded Liabilities— i.e., the on-site liabilities. Section 2(f) does not contradict Section 2(e) and does not

---

[35] Answering Br. at 26–27.

disturb the allocation of liabilities contained in Section 2(e). The Superior Court's finding that Section 2(f) allocated responsibility for the remediation of the Arthur Kill waterway required by the Administrative Consent Order from ISP Environmental to the Heyman Parties is error.

This result is supported by other provisions of the Stock Purchase Agreement and the Contribution Agreement. The Contribution Agreement defines the liabilities that are being assumed by Linden Properties Holding with language identical to the language in Section 2(e). It does not have a Section 2(f) equivalent. Ashland argues that the liabilities assumed by the Heyman Parties were transferred to them in the Stock Purchase Agreement, and because the Contribution Agreement became effective after closing, there was no need for the Contribution Agreement to include an equivalent to Section 2(f). However, the Stock Purchase Agreement states that liabilities associated with the Linden property will be transferred immediately after closing,[36] while the Contribution Agreement states that it is transferring these liabilities.[37] Reading the Stock Purchase Agreement and the Contribution Agreement together supports the conclusion that the parties' intent was to confine the Heyman Parties' obligations with respect to the Linden property to on-site liabilities.

---

[36] App. to Opening Br. at A906 ("In connection with the Linden Transfer, the Seller Parties shall assume all Liabilities.").

[37] *Id*. at A1206 ("The Company hereby assumes . . . all Liabilities.").

The indemnification provision at Schedule 5.19 Section 4 also supports the conclusion we reach. It obligates the Heyman Parties to indemnify Ashland for any losses "to the extent arising out of" the Linden Excluded Liabilities.[38] Section 4 cites the clearly defined term Linden Excluded Liabilities and does so without any qualifications. The fact that Section 4 does not contain a clause giving the Heyman Parties or Linden Property Holdings indemnification rights against Ashland for off-site liabilities does not change the unambiguous and plain meaning of this language.[39]

For the reasons discussed above, we find that the Stock Purchase Agreement unambiguously allocates all off-site liabilities, including the Arthur Kill cleanup, to Ashland. Ashland is not entitled to any indemnification for costs related to off-site remediation. We need not address Ashland's cross-appeal regarding attorney's fees.

## CONCLUSION

For the foregoing reasons, the judgment of the Superior Court is reversed and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

---

[38] *Id.* at A909.

[39] *See Alcoa World Alumina LLC v. Glencore Ltd.*, 2016 WL 521193, at *7 (Del. Super. Ct. Feb. 8, 2016) ("[T]he interpretation of indemnification provisions cannot contradict the plain text of the agreement or logic of the transaction."), *aff'd sub nom. Glencore Ltd. v. St. Croix Alumina, LLC*, 150 A.3d 1209 (Del. 2016).