IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| COX COMMUNICATIONS, INC. | § | |
| | § | No. 340, 2021 |
| Plaintiff and Counterclaim | § | |
| Defendant Below/Appellant, | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. 2021-0010 |
| T-MOBILE US, INC., | § | |
| | § | |
| Defendant and Counterclaim | § | |
| Plaintiff Below/Appellee. | § | |

Submitted: January 12, 2022
Decided: March 3, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY**-**REEVES**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **REVERSED AND REMANDED.**

Stephen C. Norman, Esquire, Jaclyn C. Levy, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Geoffrey P. Eaton, Esquire, (*argued*), Matthew L. DiRisio, Esquire, WINSTON & STRAWN LLP, Washington, DC; Mitchell G. Stockwell, Esquire, Joel D. Bush, II, Esquire, and Jeffrey H. Fisher, Esquire, KILPATRICK TOWNSEND & STOCKTON LLP, Atlanta, Georgia, *for Appellant Cox Communications, Inc.*

A. Thompson Bayliss, Esquire, Stephen C. Childs, Esquire, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Hallie B. Levin, Esquire, Peter G. Neiman, Esquire, (*argued*), WILMER CUTLER PICKERING HALE AND DORR LLP, New York, New York; and John J. Butts, Esquire, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, Massachusetts, *for Appellee T-Mobile US, Inc.*

**TRAYNOR**, Justice, for the Majority:

In this appeal, we review the Court of Chancery's interpretation of a single term—Section 9(e)—of a settlement agreement (the "Settlement Agreement") between Cox Communications and Sprint Corporation, T-Mobile U.S., Inc.'s predecessor-in-interest. In Section 9(e), Cox agreed that, before it offered wireless mobile services to its customers, it would enter into a "definitive" exclusive provider agreement with Sprint "on terms to be mutually agreed upon between the parties for an initial period of 36 months[.]" In industry parlance, Cox would be a mobile virtual network operator ("MVNO") reselling wireless mobile services from Sprint, a mobile network operator ("MNO"). Cox and Sprint never entered into such a partnership. After T-Mobile finalized a purchase of Sprint in April 2020, the combined entity bid for Cox's business, but Cox decided to partner with Verizon. After hearing that it would not be Cox's exclusive partner, T-Mobile accused Cox of breaching the Settlement Agreement.

Seeking peace of mind as it ramped up its relationship with Verizon, Cox sued T-Mobile in the Court of Chancery. Cox's complaint seeks a declaration that Section 9(e) is either an unenforceable "agreement to agree" or a Type II preliminary agreement requiring Cox and T-Mobile to negotiate in good faith. According to Cox, it is free to partner with Verizon because these good-faith negotiations failed. Shortly before trial, Cox also suggested that whatever Section 9(e) means, T-Mobile

2

cannot enforce it because the Settlement Agreement was between Cox and Sprint, and Cox never consented to an assignment.

Forced into court by Cox, T-Mobile filed a compulsory counterclaim for breach of contract. In support of this claim, T-Mobile offered that Section 9(e) means that, although Cox is not obligated to provide wireless mobile services, if it wishes to do so, it must first enter into an exclusive provider agreement with T-Mobile as the conceded successor-in-interest to Sprint. For T-Mobile, the failure of the parties' attempt to negotiate the definitive terms of the agreement means that Cox may not enter the wireless mobile market at all.

The Court of Chancery agreed with T-Mobile and permanently enjoined Cox from "partnering with any mobile network operator other than T-Mobile to provide Wireless Mobile Service before entering into an MVNO agreement with T-Mobile."[1] We disagree. Although Cox repeatedly conceded T-Mobile's standing to enforce the Settlement Agreement, Section 9(e) leaves open various material terms of the future "definitive" agreement that it explicitly contemplates. As such, it is a Type II preliminary agreement that obligates the parties to negotiate open items in good faith. We therefore reverse the decision below, vacate the injunction against Cox, and remand the case so that the Court of Chancery can determine whether Cox and T-Mobile have discharged their obligations to negotiate in good faith.

---

[1] Final Order and J. ¶ 4, Ex. A to Opening Br.

3

I

A

On December 6, 2017, Cox and Sprint signed the Settlement Agreement, which resolved two lawsuits between the parties. In the first, Sprint sought $167 million in damages—with the potential for a treble multiplier—from Cox for the alleged infringement of two patents.[2] In the second, Cox joined a subsidiary in an action seeking damages from Sprint for the alleged infringement of another patent.[3] In exchange for Sprint's dismissal of its claims against Cox, Cox agreed to withdraw as a party in the case against Sprint and to provide additional consideration.[4]

One piece of this consideration was memorialized in Section 9(e) of the Settlement Agreement. The first sentence of Section 9(e) is the crux of this dispute. It provides:

> Before Cox or one of its Affiliates (the "Cox Wireless Affiliate"), begins providing Wireless Mobile Service (as defined below), the Cox Wireless Affiliate will enter into a definitive MVNO agreement with a Sprint Affiliate (the "Sprint MVNO Affiliate") identifying the Sprint MVNO Affiliate as a "Preferred Provider" of the Wireless Mobile Service for the Cox Wireless Affiliate, on terms to be mutually agreed upon between the parties for an initial period of 36 months (the "Initial Term").[5]

---

[2] *Sprint Communications, Inc., LP, et al. v. Cox Communications, Inc., et al.*, No. 12-cv-0487 (D. Del.); App. to Opening Br. at A396–97.

[3] *TC Tech. LLC v. Sprint Corp., et al.*, No. 1:16-cv-153 (D. Del.); App. to Opening Br. at A396–97, 1209.

[4] App. to Opening Br. at A1213–22

[5] *Id.* at A1220–21.

The second sentence of Section 9(e) defines "Preferred Provider" as an exclusive partner with Cox in the MVNO business.[6]

B

After the settlement, Cox continued to study a potential entry into the wireless mobile market. It requested information from major providers—including pre-merger Sprint and T-Mobile—in 2019, but decided not to move forward.[7] Meanwhile, T-Mobile finalized its purchase of Sprint on April 1, 2020. On April 9, Cox launched a formal RFP seeking an exclusive MNO to power its entry into the wireless mobile market.[8] Verizon and T-Mobile both made offers, but T-Mobile's was significantly more expensive, even accounting for potential discounts, and it was for four years.[9] Ernst & Young, consulting for Cox, advised that T-Mobile's proposal was "significantly higher than Verizon and will break the business case easily."[10] Cox asked T-Mobile to reconsider its pricing, but T-Mobile responded that "we were pretty set on pricing" and also "[r]eminded [Cox] of their PPO

---

[6] *Id.* ("As a Preferred Provider, the Cox Wireless Affiliate will exclusively purchase Wireless Mobile Service from the Sprint MVNO Affiliate within the coverage area of the Sprint Network for resale in the Cox Wireless Affiliate's Markets[.]"). The Settlement Agreement also defines Affiliate as follows: "with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with such Person, whether now or in the future. For purposes of this definition, 'control' means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person whether through the ownership of 50% or more of the voting securities, by contract or otherwise." *Id.* at A1209.
[7] *Id.* at A1589; App. to Answering Br. at B12.
[8] App. to Opening Br. at A1613.
[9] *Id.* at A1650, A1656.
[10] *Id.* at A1647.

commitment," referring to Section 9(e).[11]  After Cox challenged T-Mobile's pricing again, T-Mobile invoked Section 9(e), asserting in a letter to Cox that the provision:

> requires Cox to utilize T-Mobile should Cox choose to provide a wireless service offering.  There is no exception to this requirement for lower prices received from another carrier until 36 months after Cox launches its offering utilizing T-Mobile and even then it is subject to T-Mobile's right to match (as further detailed in the Section).[12]

Nevertheless, T-Mobile sent Cox a revised offer on September 16, increasing the term to four-and-a-half years and compromising slightly on price.[13]  Cox estimated that this offer was $90 million more expensive than Verizon's, which was also for a shorter three-and-a-half-year term.[14]  Cox chose Verizon on September 24, 2020.[15]

After Cox informed T-Mobile that it had selected Verizon, T-Mobile responded that Cox was in "direct breach" of Section 9(e) and threatened litigation.[16]  T-Mobile accompanied its threat of litigation with a new offer, this one for three years.[17]  In an accompanying email, T-Mobile wrote that "[w]e understand that perhaps the length of the initial Term has great importance to Cox."[18]  This was T-

---

[11] *Id.* at A1657.
[12] *Id.* at A1682–83.  In its September 14, 2020 letter, T-Mobile also refused to "provide a revised pricing proposal as the previously provided pricing is very competitive[.]" *Id.* at A1683. *See also* Tr. at 30–31.
[13] App. to Opening Br. at A1663.
[14] *Id.*
[15] *Id.* at A356.
[16] *Id.* at A1691–92.
[17] App. to Answering Br. at B1315.
[18] *Id.* at B1314.

Mobile's first offer that included an initial term of 36 months.[19] Nevertheless, Cox and Verizon finalized their agreement on January 20, 2021.[20] Cox planned to launch its new service in three markets on October 15, 2021.[21]

C

Cox filed this action—naming T-Mobile, as Sprint's successor in interest, as the sole defendant—on January 6, 2021.[22] Cox's complaint seeks

> a declaration that Section 9(e) is an "agreement to agree" and is either (a) unenforceable because it does not include any material terms or (b) at most requires the parties to negotiate mutually agreeable terms in good faith. T-Mobile US, Inc. ("T-Mobile"), Sprint's successor-in-interest, claims Section 9(e) requires Cox to enter into an MVNO agreement with T-Mobile, even though T-Mobile's proposed pricing is unacceptable because it exceeds the pricing of a competitor's proposal by over $90 million.[23]

T-Mobile counterclaimed and alleged that Cox had breached the Settlement Agreement.[24] T-Mobile also requested a "permanent injunction prohibiting Cox from violating Section 9(e)."[25]

---

[19] *Id.*
[20] *Id.* at A357.
[21] Opening Br. at 14; App. to Opening Br. at A437; Tr. at 6.
[22] App. to Answering Br. at B26.
[23] *Id.* at B3.
[24] App. to Opening Br. at A93–94.
[25] *Id.* T-Mobile also alleged that Cox breached the implied covenant of good faith and fair dealing and, in the alternative, brought claims for promissory estoppel and unjust enrichment. *Id.* at A131–35.

With Cox set to launch with Verizon on October 15, 2021, the Court of Chancery agreed to expedite the proceedings.[26] Initially, Cox continued to assert, as it had in its complaint, that T-Mobile was bound by Section 9(e) but that the provision lacked material terms. In March 2021, Cox moved for judgment on the pleadings and argued that this was appropriate in part because "this dispute is not about the enforceability of the Settlement Agreement, it is about how one narrow section of the Settlement Agreement is to be interpreted and (potentially) enforced."[27] Cox further explained that "[if] a contract's meaning is unambiguous and the underlying facts necessary to its application are not in dispute, judgment on the pleadings is . . . appropriate[.]"[28] Similarly, Cox later sought documents in discovery by arguing that they were "central to Cox's bad faith, unclean hands, and antitrust defenses."[29] These defenses appeared to stem from Cox's conceded position that T-Mobile had certain rights under Section 9(e).[30]

After all this, Cox attempted to recant its manifold admissions ten days before trial. It dedicated two pages of its 90-page pretrial brief to the new claim that T-Mobile had no right to enforce Section 9(e) because Cox had not consented in

---

[26] Tr. at 6; Ch. Ct. Docket Item 35 [hereinafter D.I. __ at __].

[27] D.I. 28 at 32.

[28] *Id.* at 13. The court eventually denied Cox's motion for judgment on the pleadings. Tr. at 36.

[29] D.I. 62 at 2.

[30] The court granted Cox's motion as to two of the three sets of materials it requested. D.I. 116.

8

writing as purportedly required by Section 19 of the Settlement Agreement.[31]

Because the parties' pretrial briefs were simultaneously exchanged,[32] T-Mobile could not address Cox's belatedly advanced argument at the time. Four days after Cox submitted its pre-trial brief, the parties filed their Joint Pre-Trial Stipulation and [Proposed] Order. Cox did not specify that T-Mobile's right to enforce Section 9(e) was an open issue of fact or law, but it did repeat its request for a declaration that it had fulfilled its obligation "to negotiate in good faith toward a definitive MVNO agreement. . . with Sprint and later T-Mobile."[33]

D

Following a five-day trial in August 2021, the Court of Chancery determined that T-Mobile had standing to enforce the Settlement Agreement and that Cox had breached Section 9(e). In the trial court's view, Section 9(e) contains two promises. First, it "imposes on Cox a present obligation, immediately applicable, that it either refrain from entering the Wireless Mobile Services Market or make a deal with Sprint."[34] Second, it includes a Type II preliminary agreement that kicks in once

---

[31] App. to Opening Br. at A238–40; *id.* at A1225–26 ("19. Assignability[:] Except as set forth in Section 144, neither this Settlement Agreement nor any rights hereunder may be assigned or otherwise transferred by any Party, in whole or in part, whether voluntarily or by operation of Applicable Law, without the prior written consent of the other Parties. Any purported assignment or other transfer of this Settlement Agreement in contravention of this Section 19 shall be null and void ab initio.").

[32] *Id.* at A275; *see also* D.I. 200.

[33] App. to Opening Br. at 286 (emphasis added).

[34] Tr. at 47.

9

Cox enters an exclusive relationship with T-Mobile and requires both parties to negotiate open issues in good faith.[35]

The court explained that its interpretation reflects the fact that Section 9(e) served as consideration for Sprint's agreement to drop the patent suit against Cox. According to the court, if we were to read Section 9(e) as "simply an agreement to negotiate in good faith, Section 9(e) would be nearly worthless to Sprint."[36] Instead, the trial court interpreted the Settlement Agreement to allow "T-Mobile [to] hold Cox to its original promise: provide Wireless Mobile Services with T-Mobile, or not at all."[37]

In fashioning a remedy for Cox's breach, the Court of Chancery considered extrinsic evidence.[38] It found that, when they signed the Settlement Agreement, "both Cox and Sprint understood that Section 9(e) meant that if Cox wanted to become an MVNO . . . it had to reach an exclusive agreement with Sprint."[39] It also found that T-Mobile's damages were uncertain and noted that the Settlement Agreement contains a stipulation providing that any violations would justify

---

[35] *Id.* at 53.
[36] *Id.* at 52.
[37] *Id.* at 53.
[38] The court found facts "not to inform the unambiguous contract language, but because they inform the equities of remedying Cox's breach[.]" *Id.* at 10. Because we hold that Section 9(e) unambiguously creates a Type II preliminary agreement—and nothing more—we do not consider extrinsic evidence.
[39] *Id.*

10

"preliminary and permanent injunctive relief."[40] For these reasons, the court permanently enjoined Cox from violating Section 9(e). The implementing order states:

> Cox is hereby permanently enjoined from offering Wireless Mobile Service (as defined in Section 9(e) of the Settlement Agreement and explained in the Ruling) by partnering with any mobile network operator other than T-Mobile to provide Wireless Mobile Service before entering into an MVNO agreement with T-Mobile.[41]

Cox timely appealed. We granted the parties' request for expedited proceedings on October 27, 2021, and heard oral argument according to the schedule proposed by the parties on January 12, 2022.

## II

Cox asks us to reverse the Court of Chancery and vacate the injunction preventing it from moving forward with its Verizon partnership. Cox raises three arguments. First, it asserts that Section 9(e) is properly read as either an "agreement to agree" or a Type II preliminary agreement that only required Cox and T-Mobile to negotiate in good faith.[42] Cox says that it discharged this obligation but acknowledges that the Court of Chancery did not make a specific finding to that

---

[40] Section 30 of the agreement includes a stipulation that a "violation of the provisions contained in this Settlement Agreement shall cause a Party to suffer immediate and irreparable harm for which there is no adequate remedy at law [and] the non-breaching party shall be entitled to preliminary and permanent injunctive relief[.]" App. to Opening Br. at A1229.
[41] Final Order and J. ¶ 4, Ex. A to Opening Br.
[42] Opening Br. at 16.

11

effect. We agree with Cox's contractual interpretation and conclude that a remand is necessary so that the trial court can make the required factual findings.

Second, Cox claims—in an argument raised on the eve of trial and contradicted by its own complaint—that T-Mobile has no rights under Section 9(e) because Cox did not consent to an assignment of the Settlement Agreement.[43] We decline to reach the merits of this argument. We agree with the Court of Chancery that Cox's concessions of T-Mobile's standing over months of litigation preclude it from now arguing that T-Mobile is a stranger to Section 9(e).

Third, Cox maintains that the Court of Chancery abused its discretion by permanently enjoining Cox from partnering with any provider other than T-Mobile.[44] We do not reach this issue given our decision to reverse the trial court's contractual interpretation, vacate the injunction, and remand the case for further proceedings. Our reasoning for these holdings follows.

A

Our chief task in this appeal is the interpretation of the first sentence of Section 9(e) of the Settlement Agreement. We review questions of contract interpretation *de novo*,[45] with the objective of determining the intent of the parties from the

---

[43] *Id.* at 30.
[44] *Id.* at 39.
[45] *Exelon Generation Acq., LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017).

language of the contract.[46]  Delaware adheres to an objective theory of contracts, meaning that a "contract's construction should be that which would be understood by an objective, reasonable third party."[47]  This approach places great weight on the plain terms of a disputed contractual provision, and "we 'interpret clear and unambiguous terms according to their ordinary meaning.'"[48]  We do not consider extrinsic evidence unless we find that the text is ambiguous.[49]  Ambiguity is present "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[50]  Critically, a contractual provision is "not rendered ambiguous simply because the parties in litigation differ" as to the proper interpretation.[51]

We cannot reconcile the Court of Chancery's reading with the plain contractual text.  In particular, we do not see two promises in the first sentence of Section 9(e).  Instead, we read the provision as a single promise that unambiguously contemplates a future "definitive" agreement but leaves many terms open, "to be mutually agreed upon between the parties[.]"  Because it leaves material terms open to future negotiations, Section 9(e) is a paradigmatic Type II agreement of the kind

---

[46] *Id.*

[47] *Id.* (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[48] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012)).

[49] *Exelon*, 176 A.3d at 1267.

[50] *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[51] *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

we recognized in *SIGA v. PharmAthene*.[52]  Parties to such agreements must negotiate the open terms in good faith, but they are not required to make a deal.

1

Delaware law has long recognized "that parties may make an agreement to make a contract . . . if the agreement specifies all the material and essential terms including those to be incorporated in the future contract."[53]  Under the traditional rule, the absence or indefiniteness of material terms generally rendered an agreement unenforceable.[54]  In *SIGA I*, however, we recognized that parties could enter into two types of enforceable preliminary agreements.  Type I agreements reflect a consensus "on all the points that require negotiation" but indicate the mutual desire to memorialize the pact in a more formal document.[55]  In Type II agreements, the parties "'agree on certain major terms, but leave other terms open for future negotiation.'"[56]  Type I agreements are fully binding; Type II agreements "do[] not

---

[52] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 349 (Del. 2013) (*SIGA I*); *see also Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1119 (*SIGA II*); *and see id.* at 1140–1142 ("Type II preliminary agreements are commitments that are binding only to a certain degree, as parties to such instruments agree on certain major terms, but leave other terms open for further negotiation.") (Valihura, J., dissenting) (internal citations and quotation marks omitted).

[53] *Vale v. Atl. Coast & Inland Corp.*, 99 A.2d 396, 399 (Del. Ch. 1953) (Seitz, C.); *see also Raisler Sprinkler Co. v. Automatic Sprinkler Co. of Am.*, 171 A. 214, 219 (Del. Super. Ct. 1934); *accord Heritage Homes of De La Warr, Inc. v. Alexander*, 2005 WL 2173992, at *3 (Del. Ch. Sep. 1, 2005).

[54] *Hindes v. Wilmington Poetry Soc.*, 138 A.2d 501, 503 (Del. Ch. 1958).

[55] *SIGA I*, 67 A.3d at 349 & n.82.

[56] *Id.* (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir.1998)).

14

commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith[.]"[57]

Cox argues that the first sentence of Section 9(e) is a Type II agreement.[58] The sentence, repeated for the reader's convenience, provides:

> Before Cox or one of its Affiliates (the "Cox Wireless Affiliate"), begins providing Wireless Mobile Service (as defined below), the Cox Wireless Affiliate will enter into a definitive MVNO agreement with a Sprint Affiliate (the "Sprint MVNO Affiliate") identifying the Sprint MVNO Affiliate as a "Preferred Provider" of the Wireless Mobile Service for the Cox Wireless Affiliate, on terms to be mutually agreed upon between the parties for an initial period of 36 months (the "Initial Term").[59]

Through its plain terms, this contractual text establishes some parameters of a future MVNO relationship between Cox and Sprint. Any agreement will come "[b]efore" Cox becomes an MVNO, it will be "definitive," Sprint will be a "Preferred Provider," the initial duration will be "36 months," and open terms will be "mutually agreed upon between the parties[.]"

Section 9(e) does not reflect consensus "on all the points that require negotiation[.]"[60] It is not a Type I agreement because it leaves a number of terms open, such as price. Indeed, the text of Section 9(e) recognizes as much when it

---

[57] *SIGA I*, 67 A.3d at 349.
[58] Opening Br. at 17.
[59] App. to Opening Br. at A1221.
[60] *SIGA I*, 67 A.3d at 349 & n.82.

15

contemplates a future "definitive" agreement and provides that open terms will "be mutually agreed upon between the parties[.]" At the same time, Section 9(e) is not completely open-ended, as it requires that any agreement will identify Sprint as a "Preferred Partner" and run "for an initial period of 36 months." Because Section 9(e) reflects "agree[ment] on certain major terms, but leave[s] other terms open for future negotiation," we agree with Cox that it is a Type II preliminary agreement.

The consequences of Type II agreements are straightforward: they do not bind parties to anything more than "the obligation to negotiate the open issues in good faith . . . within the agreed framework."[61] In this case, the "agreed framework" is that any MVNO partnership between Cox and Sprint will be exclusive for three years.[62] Cox's only obligation under Section 9(e) is to negotiate open terms in good faith within the bounds of a 36-month exclusive relationship with Sprint. As we recognized in *SIGA I*, "[a] Type II agreement 'does not guarantee' the parties will reach agreement on a final contract because [] 'good faith differences in the negotiation of the open issues' may preclude final agreement."[63]

---

[61] *Id.*

[62] App. to Opening Br. at A1221.

[63] *SIGA I*, 67 A.3d at 349 n.85 (quoting *Teachers Ins. & Annuity Ass'n. of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y. 1987) (Leval, J.)).

16

Up to this point, our understanding of Section 9(e) coincides—at least in part—with the Court of Chancery's interpretation; after all, the court agreed that the first sentence of Section 9(e) includes a Type II agreement that only binds the parties to good-faith negotiations on open terms.[64] Where we part ways with the Court of Chancery is in its conclusion that the provision includes an additional "prohibitory promise"[65] that "imposes on Cox a present obligation, immediately applicable, [to] either refrain from entering the Wireless Mobile Services market or make a deal with Sprint."[66] Applying this construction, the court held that Cox breached Section 9(e) by partnering with Verizon in violation of the prohibitory promise.[67]

Cox argues that the first sentence of Section 9(e) is best read as a single promise and that bifurcating it into two commitments conflicts with the provision's plain language.[68] T-Mobile responds that the trial court's interpretation is the only way to give meaning to all the terms of the provision.[69] It also asserts that the commercial context of the Settlement Agreement supports the Court of Chancery's

---

[64] Tr. at 46.
[65] *Id.* at 52.
[66] *Id.* at 47.
[67] *Id.* at 53 ("[Cox] must honor its promise to go with T-Mobile, or not at all.").
[68] Opening Br. at 19–20.
[69] Answering Br. at 19–22.

reading.[70]    We agree with Cox and conclude that the Court of Chancery's interpretation is inconsistent with the plain text of the first sentence of Section 9(e).[71]

Returning to the terms of the first sentence of Section 9(e), the parties agreed that

> Before Cox or one of its Affiliates (the "Cox Wireless Affiliate"), begins providing Wireless Mobile Service (as defined below), the Cox Wireless Affiliate will enter into a definitive MVNO agreement with a Sprint Affiliate (the "Sprint MVNO Affiliate") identifying the Sprint MVNO Affiliate as a "Preferred Provider" of the Wireless Mobile Service for the Cox Wireless Affiliate, on terms to be mutually agreed upon between the parties for an initial period of 36 months (the "Initial Term").[72]

---

[70] *Id.* at 23.

[71] Our dissenting colleagues maintain that our contractual interpretation, "although reasonable on its face . . . is out of synch with the evidentiary record." Dissent at 7. Because we hold that Section 9(e) unambiguously creates a Type II preliminary agreement—and nothing more—we need not resort to extrinsic evidence to divine Section 9(e)'s meaning. *Exelon*, 176 A.3d at 1267. We note, even so, that there is compelling record evidence supporting Cox's contention that it did not understand Section 9(e) to include a binding prohibitory promise when it signed the Settlement Agreement. For example, during the final edits to the Settlement Agreement, Cox requested that the phrase "on terms to be mutually agreed upon" be moved to the first sentence of Section 9(e), where it modifies the "definitive MVNO agreement[.]" App. to Opening Br. at A1190. In an email transmitting this change to Sprint, a lawyer for Cox explained that, "we put back the MVNO language. . . . It's basically an agreement to agree." *Id.* at A1178. The Cox lawyer also attached a comment bubble to Section 9(e), which read: "[t]here is not a separate MVNO agreement, so we believe that this language should be inserted in this agreement. We are, in essence, agreeing to agree[.]" *Id.* at A1191. Thus, the record shows that Cox described its understanding of Section 9(e)—in terms that are in direct conflict with T-Mobile's and the Court of Chancery's interpretation—to Sprint in the days preceding the signing of the Settlement Agreement, and Sprint did not take exception. This exchange, virtually contemporaneous with the execution of the Settlement Agreement, could reasonably be viewed as more probative of the parties' intent than "backward-looking evidence gathered after the time of contracting." *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1233 n.11 (Del 1997).

[72] *Id.* at A1221.

18

Conspicuously absent from this sentence is any textual indicator—"and," "also," "additionally," etc.—that it contains more than a single promise. The sentence has a single subject ("the Cox Wireless Affiliate," a defined term), a single predicate ("will enter into"), and a single object ("a definitive MVNO agreement"). The phrase "Before Cox . . . begins providing Wireless Mobile Service" modifies the predicate, identifying when the definitive MVNO agreement will be executed. The remaining clauses modify the "definitive MVNO agreement": it will name Sprint a "Preferred Provider,"[73] run for "an initial period of 36 months," and otherwise be "on terms to be mutually agreed upon[.]" This is a single promise with multiple attributes, something altogether common in modern contracting.

The Court of Chancery rejected this interpretation for two reasons. First, the court determined that "Cox's interpretation . . . is inconsistent with the plain use of the word 'before.'"[74] To be sure, under Section 9(e) any "definitive MVNO agreement" is required to come "[b]efore" Cox launches its service. That agreement would be "definitive" and "for an initial period of 36 months," it would be exclusively with Sprint, and the remaining items must "be mutually agreed upon between the parties[.]"[75] But the fact that these modifiers describe the scope of the

---

[73] The second sentence of Section 9(e) defines "Preferred Provider" as an exclusive partner with Cox in the MNO business. *Id.* at A1221–22.

[74] Tr. at 46.

[75] App. to Opening Br. at A1221–22.

promise, while the opening "Before" phrase indicates when the promised action will occur, does not manifest an intent to create two freestanding promises. Instead, the sentence, in our view, contains a single promise with multiple constraints.

Moreover, we cannot reconcile the trial court's identification of two promises with the contractual text of the first sentence of Section 9(e). The Court of Chancery explained that "[t]he first sentence of Section 9(e) states that before Cox begins providing Wireless Mobile Service, it must enter an MVNO agreement with Sprint, now T-Mobile."[76] This is true as far as it goes. But it omits key terms of the first sentence, such as Sprint's Preferred Provider status, the contemplation of a future "definitive agreement," the proviso that any agreement would be "on terms to be mutually agreed upon between the parties," and the three-year term. The trial court accounted for these terms in its "second promise," but did not explain how they could operate independently of the sentence's only subject and predicate.[77] Put another way, the trial court's two promises do not correspond to the words used in Section 9(e).[78]

---

[76] Tr. at 46.

[77] *See id.* at 49.

[78] T-Mobile commits the same error in its briefing, representing that "Section 9(e)'s plain language" is "unambiguous and straightforward" in requiring that Cox "will enter into a contract with a Sprint affiliate before [becoming an MVNO]." Answering Br. at 19–20. And, for good measure, T-Mobile took the same tack at oral argument before this Court when it stated that "the contract says, before Cox begins providing wireless mobile services, it will do something. What is the thing it has to do? It has to enter into a definitive agreement with a Sprint Affiliate." Oral Argument at 24:00–36, *Cox Communications, Inc. v. T-Mobile US, Inc.* (No. 340, 2021) https://livestream.com/accounts/5969852/events/9949794/videos/228670605.

The Court of Chancery's second principal reason for rejecting Cox's interpretation of Section 9(e) was that the provision served as consideration for Sprint's dismissal of the patent suit against Cox. Thus, according to the trial court, Section 9(e) should not be interpreted as "nearly worthless to Sprint."[79] T-Mobile adopts this logic on appeal, arguing that "the only way for Section 9(e) to provide meaningful consideration is to operate as an enforceable prohibition against Cox becoming an MVNO of another MNO before reaching agreement with Sprint."[80]

As an initial matter, Delaware law recognizes that obligations to negotiate in good faith are not worthless.[81] Indeed, the Type II preliminary agreement in *SIGA* ultimately supported a damages award of $113 million.[82] More importantly, the argument that courts should ensure that each element of consideration in a contract— rather than the contract's total consideration—is "meaningful" misses the mark.[83] Consideration requires that each party to a contract convey a benefit or incur a legal detriment, such that the exchange is "bargained for."[84] If this requirement is met,

---

[79] Tr. at 52.
[80] Answering Br. at 23.
[81] *SIGA II*, 132 A.3d at 1110.
[82] *Id.*
[83] Answering Br. at 23 ("The only way for Section 9(e) to provide meaningful consideration is to operate as an enforceable prohibition against Cox becoming an MVNO of another MNO before reaching agreement with Sprint.").
[84] *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 446 (Del. 1996) ("Contracting is a bargained-for exchange."); *see* Restatement (Second) of Contracts § 71 ("To constitute consideration, a performance or a return promise must be bargained for.").

"there is no additional requirement of [] equivalence in the values exchanged"[85] because "we limit our inquiry into consideration to its existence and not whether it is fair or adequate."[86] In this case, neither party argues that the Settlement Agreement lacked consideration, and so we need not investigate whether Section 9(e) provided sufficient value to Sprint.[87]

In sum, the Court of Chancery's interpretation strayed from the plain text of the first sentence of Section 9(e) when it gleaned two distinct promises from a sentence in which Cox promised to do one thing. And by failing to recognize that Cox's obligation to T-Mobile was limited to good-faith negotiations consistent with the agreed-upon terms in Section 9(e)—duration and exclusivity—the Court of Chancery thrust Cox into a state of limbo. Even though T-Mobile's negotiations with Cox are bounded by its own duty of good faith,[88] it is possible—as conceivably happened here[89]— that the good-faith efforts of both parties will nevertheless fail to produce an agreement.[90] If Cox in good faith cannot come to an agreement with T-Mobile, it is permanently barred by the Court of Chancery's Order from becoming

---

[85] Restatement (Second) of Contracts § 79; *see also id.* § 72 (except for pre-existing obligations, "any performance which is bargained for is consideration.").

[86] *Osborn*, 991 A.2d at 1159.

[87] Indeed, in the Settlement Agreement, Cox transferred in-kind value estimated by Sprint to be worth $195 million, a figure that left the value embodied in Section 9(e) "TBD." App. to Opening Br. at A1144.

[88] Tr. at 52 ("[T-Mobile's] negotiation tactics are still bounded by good faith.").

[89] As explained below, the Court of Chancery stopped short of determining whether Cox negotiated in good faith. *See id.* at 78.

[90] *SIGA I*, 67 A.3d at 349 & n.85.

an MVNO with any other provider.[91]  In our view, reasonable actors in the position of Cox and Sprint would not have intended this result at the time of contracting.[92] The text of Section 9(e), moreover, cannot bear the weight of this result, nor can our decision in *SIGA I*, which explicitly contemplates that parties to Type II agreements have no obligation to enter a final agreement once they negotiate in good faith.[93]  For these reasons, we vacate the Court of Chancery's injunction against Cox.[94]

3

Section 9(e) required Cox and T-Mobile to negotiate open terms in good faith. Because the Court of Chancery found that Cox violated a "prohibitory promise" that is not in Section 9(e), the court did not fully consider whether the parties satisfied their good-faith obligations.  Instead, in denying T-Mobile's request for an order that

---

[91] *See* Final Order and J. ¶ 4, Ex. A to Opening Br.  We observe, too, that were the Court of Chancery's interpretation to stand, Cox would find itself bound to what would be essentially a restrictive covenant under which it was barred from offering wireless mobile services in perpetuity—a result T-Mobile cannot credibly defend.  Cox's only way out would be to accede to terms dictated by T-Mobile even if those terms were appropriately rejected during good-faith negotiations where, as here, the terms were inimical to Cox's business case.  This would stand the language "on terms to be mutually agreed upon" on its head and effectively write it out of the contract.

[92] *See Rhone-Poulenc*, 616 A.2d at 1196 ("The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."); *see also Osborn*, 991 A.2d at 1160 (defining an unreasonable contractual interpretation as "one that no reasonable person would have accepted when entering the contract.").

[93] *SIGA I*, 67 A.3d at 349 & n.85.

[94] *Id.*  We note that the trial court in its transcript ruling referred on a single occasion to a "condition precedent" in Section 9(e).  Tr. at 46 ("An agreement between Cox and Sprint is a condition precent to Cox's entry into the Wireless Mobile Service market.").  Otherwise, the court discussed the prohibition against Cox partnering with any entity other than Sprint as a "promise."  *See id.* at 52, 53, 70.  Neither party argues on appeal that Section 9(e) contains a condition.  This may be because the provision does not contain conditional language.  In any case, and as discussed, we conclude that Section 9(e) unambiguously contains a single promise, a Type II preliminary agreement.

23

would have required Cox to negotiate with T-Mobile in good faith, the court explained: "[e]ven assuming Cox breached that obligation [of good faith]—which I have declined to find—I would decline to order specific performance of that provision."[95] We do not understand this to mean—and Cox agrees—that the court found that Cox acted in good faith, but rather that the court made no finding one way or the other.[96] In consequence, a remand is required so that the Court of Chancery can apply our reading of Section 9(e) and determine whether Cox and T-Mobile discharged their good-faith obligations.

B

The preceding analysis is all for naught if, as Cox now argues, T-Mobile has no right to enforce Section 9(e). Cox sprung this argument on the Court of Chancery ten days before the expedited trial was to begin; in the preceding seven months, it had repeatedly conceded that T-Mobile was bound by Section 9(e). To give one example, Cox's complaint—which it has still not amended—asserts as a matter of

---

[95] Tr. at 78.
[96] Oral Argument at 12:24–13:25, *Cox Communications Inc. v. T-Mobile US, Inc.* (No. 340, 2021) https://livestream.com/accounts/5969852/events/9949794/videos/228670605.
> THE COURT: [I]f we were to agree with [you], where would that leave this case? . . . [T]here was something close to a finding by the Vice Chancellor as she discussed the specific performance remedy where she said she declined to find that Cox negotiated in bad faith or something to that effect. So if we were to agree with Cox, . . . where would that leave the case?
> COUNSEL: [I]f the interpretation was that Cox could discharge its obligation by negotiating with T-Mobile . . . in good faith, I think you would have to remand for the determination of whether Cox did so. [T]he court went out of its way to not make findings about that issue and I don't think that this court could just render on the factual record that it has.

fact that "T-Mobile is now the owner of Sprint and the successor-in-interest to Sprint's obligations under the Settlement Agreement."[97] The Court of Chancery credited this admission as binding.[98] We agree. For this reason, we decline to reach the merits of Cox's standing argument.

Judicial admissions are "[v]oluntary and knowing concessions of fact made by a party during judicial proceedings (*e.g.*, statements contained in pleadings, stipulations, depositions, or testimony; responses to requests for admissions; counsel's statements to the court)."[99] Generally, judicial admissions are "conclusive and binding both upon the party against whom they operate, and upon the court."[100] This doctrine does not apply to admitted legal conclusions.[101] That said, predicate facts that support a legal conclusion may be deemed admitted when a party "assume[s] and admit[s] the facts necessary to reach the conclusion[.]"[102] This is a narrow rule that applies under unique circumstances, but it fairly describes what happened in this case.

---

[97] App. to Answering Br. at B6.

[98] Tr. at 36–38.

[99] *Merritt v. United Parcel Serv.*, 956 A.2d 1196, 1201 (Del. 2008).

[100] *Id.* at 1201–02.

[101] *Levinson v. Del. Comp. Rating Bureau, Inc.*, 616 A.2d 1182, 1186 (Del. 1992)

[102] *BE & K Engineering Co., LLC v. RockTenn CP, LLC*, 39 Del. J. Corp. L. 321, 2014 WL 186835 at *12 (Del. Ch. 2014), *aff'd* 103 A.3d 512 (Del. 2014) (TABLE) (internal citation and quotation marks omitted); *see, e.g., Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.* 976 F.2d 58, 60–61 (1st Cir. 1992) (plaintiff's admission that a contract governed the dispute, which was incorporated into a count for breach of contract, was binding).

Cox filed its complaint on January 6, 2021. In the caption, it named a single defendant: "T-Mobile US, Inc., as successor in interest to Sprint Corporation."[103] In the body, it asserted that T-Mobile had succeeded to Sprint's obligations and requested a declaration that "Section 9(e) is either (a) an unenforceable agreement to agree or (b) only requires Cox and T-Mobile to negotiate in good faith."[104] This complaint remains operative.

In the ensuing seven months of expedited litigation, Cox maintained its position that T-Mobile was contractually bound to the provisions of Section 9(e). For example, when it moved for judgment on the pleadings in March 2021, Cox represented to the trial court that its dispute with T-Mobile was "not about the enforceability of the Settlement Agreement, it is about how one narrow section of the Settlement Agreement is to be interpreted and (potentially) enforced."[105] Similarly, when Cox sought documents in discovery that T-Mobile wanted to shield, Cox told the trial court that they were "central to Cox's bad faith, unclean hands, and antitrust defenses."[106] These defenses were ostensibly dependent on T-Mobile being bound by Section 9(e), and the court granted Cox's motion as to two of the three sets of materials it requested.[107]

---

[103] App. to Answering Br. at B2.
[104] *Id.* at B24.
[105] D.I. 28 at 32.
[106] D.I. 62 at 2.
[107] D.I. 116.

Ten days before trial, Cox sought to walk back the repeated concessions that had dictated the course of the expedited proceedings. In its pretrial brief, Cox set aside two pages—out of 90—for its new claim that T-Mobile had no right to enforce Section 9(e) because Cox had not consented in writing as purportedly required by Section 19 of the Settlement Agreement.[108] Because the parties' pretrial briefs were simultaneously exchanged, T-Mobile could not address Cox's belatedly advanced argument at the time. What is more, Cox's anti-assignment claim was only halfheartedly offered: in the Joint Pre-Trial Stipulation and [Proposed] Order filed on August 10, 2021—four days *after* Cox put its new argument in play—neither party identified T-Mobile's right to enforce the Settlement Agreement as an issue of fact or law that remained to be litigated.[109] In the same document, Cox continued to press its request for a declaration that it had fulfilled its obligation "to negotiate in good faith toward a definitive MVNO agreement . . . with Sprint *and later T-Mobile*"—an odd request if T-Mobile had no right to enforce Section 9(e).[110]

We agree with the Court of Chancery that Cox's concessions of T-Mobile's standing over months of litigation preclude it from now arguing that T-Mobile is a stranger to Section 9(e).[111] The facts before us are similar to those at issue in *BE & K*

---

[108] App. to Opening Br. at A238–40.
[109] *Id.* at A358–60.
[110] *Id.* at A286 (emphasis added).
[111] *See* Tr. at 36–38.

27

*Engineering Co., LLC, v. RockTenn CP, LLC*.[112]  In that case, the defendants asserted

in an out-of-state lawsuit that one agreement, known as the Engineering Agreement,

governed the plaintiff's services on a project.[113]  This was important because the

Engineering Agreement selected Wilmington, Delaware as the required forum for

related disputes.[114]  Appearing in the Court of Chancery, the same defendants

"represented to th[e] court that the Engineering Agreement govern[ed.]"[115]  The

defendants in *BE & K* then changed course.  Facing a summary judgment motion,

they asserted—despite their "numerous [and] pervasive" admissions about which

contract controlled—that the Engineering Agreement did not apply.[116]

The Court of Chancery held that the defendants' admissions were binding.  It

noted that the defendants had "represented clearly, directly, and repeatedly to this

court and the Georgia Court" that the Engineering Agreement applied and had done

so as a purported assertion of fact.[117]  It further observed that the defendants "were

unable to hew consistently to their new position and tried to play both sides of the

---

[112] *BE & K Engineering*, 2014 WL 186835, at *1.
[113] *Id.*
[114] *Id.*
[115] *Id.* at *6; *see also Schott Motorcycle*, 976 F.2d at 61 (plaintiff's admission that contract governed dispute, which was incorporated into a count for breach of contract, was binding).
[116] *BE & K Engineering*, 2014 WL 186835, at *6.
[117] *Id.* at *11–12.

fact/law divide."[118]  It therefore entered summary judgment in favor of the plaintiffs and the application of the Engineering Agreement.[119]

We see no reason why the same result should not obtain here.  Cox made clear, direct, and repeated concessions that T-Mobile had stepped into Sprint's contractual shoes.  These admissions formed the basis of Cox's declaratory judgment action, which forced T-Mobile into court and required it to make compulsory counterclaims and cooperate with discovery.  They were also central to Cox's attempt to secure judgment on the pleadings and to its discovery strategy.  And even after Cox belatedly introduced its new claim in its pre-trial brief, it never fully embraced it, leaving it out of the Joint Pre-Trial Stipulation it prepared with T-Mobile.  In short, Cox must live with its concessions that T-Mobile had assumed Sprint's rights and obligations under Section 9(e).

## III

We reverse the decision below, vacate the injunction against Cox, and remand the case so that the Court of Chancery can determine whether Cox and T-Mobile have discharged their obligations to negotiate in good faith as required by Section 9(e) of the Settlement Agreement.

---

[118] *Id.*
[119] *Id.* at *1.

**VALIHURA, J.**, Concurring in part, dissenting in part, joined by **MONTGOMERY-REEVES, J.**:

We agree with the Majority that Section 9(e) reasonably can be read as a Type II agreement. But we think the provision is ambiguous and can be read as the Vice Chancellor reads it as well. Although Section 9(e) is lengthy, for convenience, we quote the sentence that is the focus of this Court's attention:

> *Before Cox or one of its Affiliates (the "Cox Wireless Affiliate"), begins providing Wireless Mobile Service (as defined below), the Cox Wireless Affiliate will enter into a definitive MVNO agreement with a Sprint Affiliate (the "Sprint MVNO Affiliate") identifying the Sprint MVNO Affiliate as a "Preferred Provider" of the Wireless Mobile Service for the Cox Wireless Affiliate, on terms to be mutually agreed upon between the parties for an initial period of 36 months (the "Initial Term"). . . .* [1]

Also for convenience, we refer back to a description of a Type II agreement from *Siga v. PharmAthene*:[2]

> Type II preliminary agreements are commitments that are "binding only to a certain degree," as parties to such instruments "agree on certain major terms, but leave other terms open for further negotiation."[3] In other words, a Type II preliminary agreement is "a contract 'that expresses mutual commitment to a contract'" on certain agreed terms, with others to be negotiated.[4] In the context of a Type II preliminary agreement, the parties "recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open."[5] However, Type II preliminary agreements

---

[1] A1221 (Settlement Agreement, § 9(e)); A145 (T-Mobile Counterclaim) (emphasis added).

[2] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108 (Del. 2015) (Valihura, J., dissenting).

[3] *Vacold LLC v. Cerami*, 545 F.3d 114, 124 (2d Cir. 2008) (internal quotations omitted) (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs. Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)).

[4] *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 206 n.3 (2d Cir. 2002) (quoting *Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).

[5] *Vacold*, 545 F.3d at 124 (internal quotations omitted) (quoting *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996)).

1

"do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework."[6]  Therefore, a party to a Type II preliminary agreement "may only demand that [the] counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms.  This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract."[7]  However, a party to a Type II preliminary agreement is barred "from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement."[8]  Ultimately, "[i]f the parties 'fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation.'"[9]

The Court of Chancery found that Section 9(e) involved two promises:  an enforceable prohibition, and an agreement to "certain terms" and to "negotiate in good faith."[10]  The Majority holds that Section 9(e) can *only* be read as a Type II agreement.  However, we think the Vice Chancellor's reading of the "before" modifying phrase is also reasonable, *e.g.,* that phrase carries more force than merely serving as a temporal modifier of "will enter."  T-Mobile presses this point on appeal, arguing that "[n]o reasonable party

---

[6] *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (internal quotations omitted) (alterations in original) (quoting *Adjustrite Sys., Inc.*, 145 F.3d at 548).

[7] *Westerbeke Corp.*, 304 F.3d at 206 n.3 (internal quotations omitted) (alternations in original) (quoting *Tribune Co.*, 670 F. Supp. at 498).

[8] *Tribune Co.*, 670 F. Supp. at 498.

[9] *Vacold LLC*, 545 F.3d at 124 (quoting *Adjustrite Sys., Inc.*, 145 F.3d at 548).

[10] Opening Br. Ex. A, at 46; *see also id*. at 77 ("Section 9(e) comes in two parts:  A prohibition on Cox offering wireless mobile services unless with Sprint, and an obligation that Cox negotiate with T-Mobile in good faith.").

would understand a promise to 'enter into' a contract 'before' providing Wireless Mobile

Service, to mean only 'negotiate in good faith' before providing that service."[11]

As to the enforceable prohibition in the "before" clause, the Vice Chancellor

reasoned that it was in the nature of a condition precedent:

> Cox's interpretation, that any MVNO Agreement must be exclusive with
> Sprint but that Cox is free to partner with a different MNO, is inconsistent
> with the plain use of the word "before."

> An agreement between Cox and Sprint is a condition precedent to Cox's
> entry into the Wireless Mobile Service market.  Sprint cannot force Cox to
> enter into an MVNO agreement, nor can it force Cox to become a Wireless
> Mobile Service provider.  But if Cox chooses to go down that path, it must
> strike a deal with Sprint.[12]

The Vice Chancellor's view that under Section 9(e), Cox could not enter the market unless

and until it entered into an agreement with a Sprint Affiliate is supported by the plain

language of the provision.

The Court of Chancery further explained that "before" means that upon the

execution of the Settlement Agreement, Cox was "immediately" bound to an obligation

---

[11] Answering Br. at 21.  As T-Mobile contends, the first promise guaranteed Sprint a 36-month head-start with Cox's future MVNO business once Cox decided to enter the market.  The second promise reflects the reality that the industry was rapidly changing and that price negotiations needed to be deferred until Cox decided to become an MVNO. *Id.* at 25–26.

[12] Opening Br. Ex. A, at 46.  Although the Majority contends that no party on appeal advances this "condition precedent" argument, T-Mobile, in essence, does.  T-Mobile argues on appeal that if Cox wants to start providing wireless mobile service, it 'will enter into' a contract with a Sprint Affiliate 'before' doing so."  Answering Br. at 20; *see also id.* at 27 (arguing that, "[b]ut to enter that market, Cox needed to reach agreement with T-Mobile").

3

either to refrain from providing such service or to enter into a contract with a Sprint Affiliate.  It concluded that:

> This promise is not preliminary, nor is it part of an agreement to agree:  It is an enforceable freestanding promise that if the parties do not come to a definitive MVNO agreement, Cox cannot provide Wireless Mobile Services.  This promise imposes on Cox a present obligation, immediately applicable, that it either refrain from entering the Wireless Mobile Services market or make a deal with Sprint.[13]

The Vice Chancellor's reading of the word "before" is reasonable *i.e.,* that as a condition to Cox proceeding "down that path," Cox must strike a deal with Sprint.  Accordingly, we submit that there are two reasonable readings of Section 9(e).[14]

---

[13] Opening Br. Ex. A, at 47.

[14] *See also Westerbeke Corp.*, 304 F.3d 200.  In *Westerbeke Corp.* the Second Circuit Court of Appeals resolved a similar dispute where the parties, an arbitrator, and a district judge had divergent views as to whether a contractual provision was a preliminary agreement or a contract with a condition precedent.  The contract provision in *Westerbeke* stated:

> When DAIHATSU desires to sell in the Territory other water-cooled gasoline engines of fewer than four cylinders for the Products than the Engines [sic].  WESTERBEKE shall have the first refusal during the first six months after the date of DAIHATSU's first offer of the Estimate for the said engines.  During the said six months of the first refusal for WESTERBEKE, DAIHATSU shall not offer the said engines to any third party in the Territory and if DAIHATSU/NM and WESTERBEKE come to an agreement on the specifications, prices, minimum purchase quantities, delivery terms, etc. of the said engines, such engines shall be added to the Engines as defined by the [sic] paragraph 1 of the [sic] Article 2 of this agreement.  In such case, if need be, the parties shall amend the provisions of this agreement on the Engines added.

*Id.* at 204.  Daihatsu argued that the provision was a preliminary agreement to agree, whereas Westerbeke argued it was a contract with a condition precedent.  After finding the provision to be ambiguous, the arbitrator in the case agreed with Westerbeke, but the district court agreed with Daihatsu.  Writing for the Second Circuit, then-judge Sotomayor referred to the provision as "facially ambiguous," pointing specifically to the first phrase.  (Like the lack of grammatical structure in the first phrase in *Westerbeke*, the first comma in Section 9(e) appears to be a mistake.).  The Second Circuit determined that Daihatsu could not show that the arbitrator had disregarded a clearly applicable principle of contract construction in reading the provision as a contract with a condition precedent.  It noted also that the arbitrator had found that the evidence supported that

4

The Majority's holding that Section 9(e) is unambiguous means that there is only one reasonable reading of it.[15]  The fact that sophisticated contracting parties may have divergent readings of a contractual provision does not necessarily render it ambiguous.[16]  As this Court recently observed:

> When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language. Contracts will be interpreted to "give each provision and term effect" and not render any terms "meaningless or illusory."  "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contact's terms and provisions."  Language is ambiguous if it is susceptible to more than one reasonable interpretation.  An interpretation is unreasonable if it "produces an absurd result" or a result "that no reasonable person would have accepted when entering the contract."  "The parties' steadfast disagreement over interpretation alone will not render the contract ambiguous."[17]

This is a well-established proposition.  Here the parties both maintain that Section 9(e) is unambiguous, but disagree on its meaning.  The trial judge viewed Section 9(e) as

---

conclusion.  Accordingly, and in keeping with wide deference granted to arbitral awards, it reversed the district court and remanded with instructions to confirm the arbitral award.

[15] *See In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1131 (Del. 2020) (recognizing that under Delaware law, a contract "is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings"); *BLGH Holdings LLC v. enXco LFG Holding, LLC*, 41 A.3d 410, 414 (Del. 2012) (stating that "the plain language of a contract is unambiguous" when it is "fairly or reasonably susceptible to only one interpretation"); *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011), *as corrected* (Sept. 6, 2011) (applying the plain language of the Limited Liability Company Act because the text was deemed "unambiguous" as "it is not susceptible of two reasonable interpretations").

[16] *See, e.g., Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.  Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.").

[17] *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (footnotes omitted).

5

unambiguous as does the Majority — but they also disagree on its meaning. Our panel is divided with the Majority holding that its view is the only reasonable one,[18] and two panel members contending that there could be two reasonable readings rendering Section 9(e) ambiguous.

Differences among panel members have not precluded similar findings by this Court that a provision can be read reasonably only one way.[19] Although there is authority to the contrary,[20] we are not, here suggesting that a divided panel — where one or more members

---

[18] "Unreasonable" means: "not guided by reason; irrational or capricious." Black's Law Dictionary (11th ed. 2019).

[19] *See, e.g., Manti Holdings, LLC*, 261 A.3d at 1211 (holding that, "[t]he only reasonable interpretation of the Refrain Obligation is that the Petitioners agreed to not seek a judicial appraisal if Carlyle and the board approved a Company Sale," and noting that "[i]f the Termination Provision is read in isolation, the Court might be inclined to agree with [Petitioner's] analysis," but, nevertheless, finding that reading to be "commercially unreasonable"); *see also id.* at 1212 n.89 (The Majority acknowledges that "[t]he Petitioners and the Dissent suggest several changes the parties could have made to make it clearer that the Refrain Obligation was intended to survive termination," . . . and that "[w]ith the benefit of hindsight, these changes might have headed off the current dispute," but, nevertheless, holding that the "Refrain Obligation in present form *clearly waives* the Petitioners' appraisal rights."); *but see id*. at 1237 (Valihura, dissenting) ("Given that there is a reasonable reading of these provisions in Petitioner's favor, I would find the Stockholder's Agreement's unclear drafting renders it at least ambiguous, and so not sufficiently clear to divest Petitioners of their statutory right to appraisal."). *See also Bartolomucci v. Fed. Ins. Co.*, 770 S.E.2d 451, 456 (Va. 2015) ("Contract language is not ambiguous simply because the parties or courts in different jurisdictions disagree about how to understand the language.").

[20] *See Petersen v. Magna Corp.*, 773 N.W.2d 564, 575 (Mich. 2009) ("[T]he mere fact that different justices of this Court, judges of the Court of Appeals, and trial judges disagree on the meaning of statutory language suggests that ambiguity exists."); *Lincoln Sav. Bank, S.A. v. Wisconsin Dep't. of Revenue*, 573 N.W.2d 522, 531 (Wis. 1998) (Abrahamson, C.J., concurring) ("[W]hen courts or judges disagree about the interpretation of a law, the law is, by definition, capable of being understood in two or more different senses by reasonably well-informed persons even though one interpretation might on careful analysis seem more suitable to this court."); *Pitcher v. Principal Mut. Life Ins. Co.*, 870 F. Supp. 903, 915 (S.D. Ind. 1994), *aff'd,* 93 F.3d 407 (7th Cir. 1996) ("The fact that the parties disagree does not prove, of course, that the policy is ambiguous. But the disagreements among the district court and the panel members . . . show that there is room for reasonable argument about how to apply the policy phrase" at issue.).

6

contend that there is another reasonable interpretation — automatically "creates" an ambiguity. Nor is it necessary to wade into that interesting debate because here, the less-than-ideally-drafted provision alone is facially ambiguous and allows ample support for both views. Even Cox has suggested that "[t]o the extent the Court concludes that the provision is ambiguous because there are two reasonable interpretations of 9(e), it should consider parole evidence."[21]

In addition, the trial court more firmly grounds the reasonableness of its reading in the commercial context the parties were in which included, among other things, the fact that Sprint was on the eve of pressing forward with its patent infringement suit against Cox. The court also considered that Cox was not yet an MVNO, and its entry into that market, according to the Vice Chancellor, had been on the back burner since 2007.[22] By contrast, the Majority summarily concludes that "reasonable actors in the position of Cox and Sprint would not have intended this result at the time of contracting."[23] It also points to the generic and uncontested notion that an agreement to agree can have value.

Finally, although the Vice Chancellor discussed her factual findings in the context of balancing the equities, the Vice Chancellor's reading of Section 9(e) is also consistent with the weight of the evidentiary record as she summarized it. The Majority's

---

[21] Opening Br. at 26. As noted, though, Cox's main argument is that Section 9(e) is "unambiguously a Type II preliminary agreement." *Id.*

[22] Opening Br. Ex. A., at 7.

[23] Maj. Op. at 25.

interpretation, although also reasonable on its face, by contrast, is out of synch with the evidentiary record.

The evidentiary record regarding Section 9(e), including the trial testimony and depositions, not only supports the Vice Chancellor's interpretation, it decidedly points in favor of reading Section 9(e) as more than a Type II agreement. For example, the Court of Chancery found that:

- "*At the time of contracting*, both Cox and Sprint understood that Section 9(e) meant that if Cox wanted to become an MVNO and offer wireless mobile service, it had to reach an exclusive agreement with Sprint. As a preview, I find these facts not to inform the unambiguous contract language, but because they inform the equities of remedying Cox's breach by entering into an MVNO agreement with Verizon."[24]

- "*Contemporaneous documents* reflect that at the time of contracting, Cox understood Section 9(e) to require it to partner with Sprint in order to offer wireless mobile service."[25]

- "[Cox] understood Section 9(e) to mean exactly how I have construed it today, *at the time of contracting* and when it decided to abandon the Sprint MVNO and pursue other options."[26]

These broadly-phrased findings are clearly based upon the court's assessment of the evidence of the parties' intentions at the parties' time of contracting. In making these factual findings, the Court of Chancery did note the dearth of helpful testimony from witnesses with knowledge of the contractual negotiations:

- "In considering the parties' understandings through negotiations and at the time of contracting, I note that Cox's lead negotiator and CFO,

---

[24] Opening Br. Ex. A, at 10.

[25] *Id.* at 14.

[26] *Id*. at 76.

8

Mark Bowser, could remember almost nothing at trial, and Cox did not call the in-house counsel who did the drafting as a witness."[27]

- "Bowser, Cox's lead negotiator, testified at trial only as to Cox's new litigation position. He could not remember specifics of the negotiations, who was present, or anything of substantial importance from 2017."[28]

Nevertheless, the trial court based its conclusions on the contemporaneous evidence that did exist. As detailed by the trial court, overall, the evidence did not aid Cox's position. For example, the trial court found:

- "Sprint raised the idea of including a potential MVNO commitment as a term. Sprint requested that Cox agree to make Sprint its exclusive supplier of wireless service if Cox launched an MVNO business."[29]

- "Cox proposed language minimizing the obligation, suggesting that (i) it only be required to 'engage in good faith negotiations,' or that (ii) Sprint would get 'first priority' only if Sprint's pricing was 'substantially similar to a competitive, commercial offering,' Sprint rejected those proposals."[30]

- "Sprint's November 22, 2017 'best and final' . . . asked Cox to commit that '[b]efore Cox begins reselling Wireless Mobile Service,' it 'will enter into a definitive MVNO agreement with Sprint,' and 'will exclusively purchase Wireless Mobile Service from Sprint . . . for an initial period of 36-months' with a price match to follow. Sprint explained to Cox that these terms gave Sprint '36-month head-start exclusivity' if Cox decided to sell wireless mobile services."[31]

---

[27] *Id*. at 10.

[28] *Id.* at 17.

[29] *Id.* at 10.

[30] *Id.* at 10–11.

[31] *Id.* at 11.

- "As Sprint's then-chief intellectual property counsel Lee Lauridsen explained, this best and final offer expressly rejected Cox's proposal that they just be required to have good faith negotiations."[32]

- "Cox's attorney, Marcus Delgado, confirmed that there was no other conversation between Cox and Sprint memorializing a shared understanding of 9(e)."[33]

- "Both sides testified they didn't agree on any price for an eventual MVNO agreement because that would have been too speculative. It was unknown if or when Cox would enter that business, and it made much more sense to negotiate price closer in time to entering the market. This is supported by testimony from Bowser, Lauridsen, and Sprint's former CFO, Tarek Robbiati. Robbiati testified that because the parties did not know when or if Cox would enter the wireless market, the parties deferred discussing a final price in the Settlement Agreement. As he explained, 'You couldn't negotiate the price at this stage of the settlement agreement because of the dynamics of this industry and how quickly prices change.'"[34]

Although the Majority places great weight on the "comment bubble" in its single footnote discussing the evidentiary record, the Vice Chancellor considered that also and apparently declined to weigh the evidence in Cox's favor:

- "During drafting, a Cox 'comment bubble' referenced the MVNO agreement as an 'agreement to agree,' explaining it needed to be placed within the Settlement Agreement as opposed to a separate agreement because there was not yet any MVNO Agreement."[35]

- "Sprint's negotiator, Lauridsen, emphatically testified that this comment was in response to his question about the placement of the MVNO term, that the comment bubble did not change the meaning of the MVNO term, and if it had, he would have pushed back and gone

---

[32] *Id.* at 11–12.

[33] *Id.* at 12.

[34] *Id.* at 12–13.

[35] *Id.* at 13.

10

to trial. Delgado also testified that the comment bubble pertained to the term's placement."[36]

Other evidentiary findings undercutting Cox' position include:

- "JX 136, a December 2019 [sic] Cox internal evaluation of the settlement, stated 'MVNO – Sprint to be Preferred Partner' if 'Cox enters wireless market and Sprint remains within 3 percent of top industry performance standards."[37]

- "Sprint's Lauridsen credibly reiterated on cross that 'there could not have been any possibility that Cox believed that this wasn't an enforceable agreement if they became a[n] MVNO." Sprint also shared this understanding."[38]

- "Cox's Executive VP and Chief Product and Technology Officer Kevin Hart explained to a Cox VP that the team signed an NDA 'and we have the Sprint MVNO obligation so I would only share on a need to know and remind them of our legal situation."[39]

- "[Krueck] knew Section 9(e) imposed an 'MVNO obligation to Sprint' that 'potentially blocked' Cox from 'moving forward with Verizon,' and the team would have to plan around it."[40]

- "Hart instructed Krueck to use Sprint as the first scenario for the analysis, which Krueck understood was 'due to the settlement agreement between Sprint and Cox.'"[41]

---

[36] *Id.* at 14.

[37] *Id.* Although the transcript ruling suggests that the slide is dated December 2019 (Tr. at 14), the slide that appears in the appendix (identified as JX136) is actually dated December 12, 2017. A1501. We believe the reference to 2019 is likely a transcription error. Thus, this evidence is nearly contemporaneous with the Settlement Agreement.

[38] *Id.* at 15.

[39] *Id.*

[40] *Id.* at 15–16.

[41] *Id.* at 16.

Further, the Court of Chancery expressly found that Cox's current litigation position was not developed until 2019, and then, only after consulting with Cox's outside litigation counsel:

- "In March of 2019, Cox's legal team and outside counsel strategized about how to handle Section 9(e). After months of work, the team offered its 'key deliverable' per JX 211: Cox's litigation interpretation of 9(e), that at most it requires Cox to negotiate in good faith. *Delgado conceded this position developed in 2019 was not Cox's contemporaneous understanding of Section 9(e). In fact, Sprint had rejected this term in negotiations.*"[42]

- "As Sprint's former employee Gordon Simonson explained, Sprint and Cox had it figured out until T-Mobile bought Sprint."[43]

- "Cox's legal team developed its litigation interpretation of Section 9(e) and took a gamble with its eyes wide open, modeling the cost of litigation and settlement."[44]

Although this evidence may be "backward-looking," it reveals a concession that the interpretation Cox is advancing now is not one that it held at the time of contracting.

---

[42] *Id.* at 17 (emphasis added). Delgado conceded that this position, developed in 2019, was not Cox's contemporaneous understanding of Section 9(e):

> Q:  Mr. Delgado, do you recall when Cox formed this interpretation of Section 9(e)?
>
> A:  I believe we formed this interpretation in 2019 sometime.
>
> Q:  And, indeed, it was only after consulting with outside counsel more than a year after this agreement was signed that Cox developed the interpretation of Section 9(e) that it's offering in this litigation. Correct?
>
> A:  That's correct.

A403 (Delgado Testimony at 99).

[43] Opening Br. Ex. A, at 19.

[44] *Id.* at 76.

These detailed findings, which support the Vice Chancellor's reading, were made after considerable effort by the Vice Chancellor as part of expedited proceedings. The proceedings included five days of trial where the record included 968 exhibits, as well as testimony from 23 witnesses, including three experts, followed by post-trial argument. Against the Vice Chancellor's careful consideration and synthesis of the complete evidentiary record, the Majority rejects this careful consideration in a lone footnote observing that there is compelling record evidence supporting Cox's reading of Section 9(e) based primarily on three pieces of evidence -- which the Vice Chancellor considered. Because we typically defer to the trial judge's weighing of the evidence and credibility findings,[45] we prefer to defer to the trial judge's overall assessment of the weight of the evidence.

In sum, we believe that the language of Section 9(e), reinforced by the evidentiary record, suggests that the better course here would have been to reverse the trial court's conclusion that Section 9(e) was clear and unambiguous, and instead, hold that Section 9(e) is ambiguous. This Court could then have remanded the case to request the Vice Chancellor to make fact findings as to what the extrinsic evidence shows as to the parties' intention regarding Section 9(e). However, based on the extensive record and fact findings

---

[45] *See AT&T Corp. v. Lillis*, 970 A.2d 166, 169-70 (Del. 2009) ("We defer to the trial court's findings as to the significance of the extrinsic evidence[.]"); *Hudak v. Procek*, 806 A.2d 140, 150 (Del. 2002) (observing that "this Court regularly defers to the unique opportunity of the fact-finder, whether judge or jury, to evaluate live witnesses, to evaluate their demeanor and credibility and to resolve conflicts in the testimony," and that "[t]he weight to be given to evidence, however, is for the trier of fact to determine.").

13

the court has already made and evaluated in the context of balancing the equities, the court likely could make such findings based upon the present record.

For these reasons, we respectfully **CONCUR** in part, and **DISSENT** in part.